MARCUS, Circuit Judge:
Richard Junior Frazier appeals his conviction for kidnapping. He claims that the district court abused its discretion by excluding certain expert testimony of a forensic investigator, while allowing the government to present expert evidence on the same issue. After thorough review of the record, we conclude that the district court’s evidentiary rulings were neither an abuse of discretion, nor “manifestly erroneous.” Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997) (citation omitted). More generally, we reaffirm the basic principle that an appellate court must afford the district court’s gatekeeping determinations “the deference that is the hallmark of abuse-of-discretion review.” Id. at 143, 118 S.Ct. at 517. Accordingly, we affirm.
I.
A.
The defendant, Richard Junior Frazier, was charged on December 6, 2000, by a grand jury sitting in the Northern District of Georgia in a one-count indictment with kidnapping in violation of 18 U.S.C. § 1201(a)(1).[1] The indictment also alleged *1249 that, pursuant to 18 U.SiC. .§ 3559(c), the “three-strikes” statute, the defendant had multiple prior convictions for qualifying serious, violent felonies to mandate a life sentence.[2] He entered a plea of not guilty and vigorously contested the charges at trial.
The relevant facts in this sad case are these. At some time after eight o’clock on the evening of October 31, 2000, an eighteen-year-old student (“the victim”) stopped at a Wal-Mart store in Cornelia, Georgia to check the prices of Halloween candy. According to the victim’s account, she was abducted by the defendant after leaving the Wal-Mart. She walked to her car and unlocked the door, when she was confronted by the defendant, Frazier, who was carrying a knife in his right hand pointed at her. He asked the victim: ‘Will you take me where I want to go?” R.7 at 149. Fearing for her life, the victim complied and at Frazier’s demand sat in the driver’s seat. Frazier entered the back seat of the vehicle, sat directly behind the victim, and directed her to drive out of the parking lot.[3]
Frazier initially told the victim that he wanted to visit his son in White County, Georgia, but eventually directed her off the paved road and onto a dirt road leading to a secluded, wooded area. After they reached this deserted location, Frazier instructed the victim to turn the engine off, moved into the front passenger seat, positioned the knife in his right hand, and ordered the victim to remove her pants and underpants. She disrobed.. The defendant then removed his own clothing and sexually assaulted her at knifepoint, raping her repeatedly and variously in a crime of unspeakable brutality, in the front of the vehicle and in the back seat of her car. According to the victim, the defendant apologized.for not being able to ejaculate because he was drunk. •
After the sexual assaults were completed, the defendant dressed, took control of the car; and drove north on U.S. Highway 441 toward North Carolina. Frazier stopped twice, first at a Citgo convenience store where he bought gasoline, and then at a Circle-K store where he bought cigarettes. At both stops, Frazier made the *1250 victim accompany him into the convenience stores, warning her not to do anything “stupid.”[4] R7 at 162,163.
In the meantime, the victim’s fiancé and family members became alarmed over her absence. Her fiance, Anthony Defoor, expected to meet her after she visited the Wal-Mart, and by eleven o’clock, had become very concerned. He began searching for her and contacted her parents. The victim’s mother called 911 to report her missing, and her father, Larry Kimsey (“Kimsey”), drove off in search of his daughter. Kimsey spotted his daughter’s vehicle, followed it for several miles, and pulled up alongside it, noticing that his daughter was in the front passenger seat and a stranger was driving the car. He attempted unsuccessfully to flag down his daughter’s car by driving alongside the vehicle, flashing his brake lights, and rolling down his windows and motioning with his arm for the car to stop. Kimsey continued to chase the vehicle, mile after mile, at speeds up to 80 miles per hour. Indeed, when Kimsey pulled alongside his daughter’s car, the defendant swerved and cut him off. Eventually, although he was unable to stop the car, Kimsey was able to attract the attention of a passing deputy sheriff by repeatedly flashing his brake lights.
At this point, the officer driving a marked police car made a u-turn and began chasing the two vehicles. The deputy activated his flashing blue lights in an attempt to stop the victim’s car, but Frazier did not pull over. The deputy called for back-up and additional officers joined the chase, pursuing the victim’s car with their lights and sirens activated. Still, Frazier did not stop; instead he accelerated the vehicle, leading the police on a chase at speeds of up to 100 miles per hour for many miles, passing stop signs, repeatedly crossing the center line, and running red lights without slowing or stopping.[5] Twice, when law enforcement officers tried to cut him off, Frazier tried to hit their cars. Frazier continued his flight at high speeds, crossing into North Carolina, and driving north on North Carolina Route 28. Driving at high speed on this twisting, winding road, Frazier frequently swerved out of the proper lane, until eventually he lost control of the vehicle and crashed into a power pole alongside Route 28. The officers radioed for emergency medical and fire authorities.
The police immediately removed both Frazier and the victim from the car. After being asked why the vehicle was fleeing the police, the victim replied that the defendant had kidnapped her from the Wal-Mart at knifepoint. When Frazier was searched immediately following his arrest, the officers discovered two knives on his person. One of the knives was found in his right hip pocket, locked in the open position with a partially serrated blade.
The victim was transported to a local hospital where, because she claimed to *1251 have been sexually assaulted, she was treated by a Sexual Assault Nurse Examiner. The nurse examined the victim and prepared a rape kit by removing loose hairs from the victim and from her clothing. She also swabbed for fluids. The nurse-examiner later testified that the victim’s manner and demeanor were consistent with what she described as a post-traumatic stress demeanor, and said that the victim had suffered traumatic bruising to her cervix.[6] Later testing of the swab and hair evidence recovered from the examination failed to establish that any hair or fluid recovered from the victim’s person or clothing matched Frazier’s. Similarly, although various pieces of evidence, including seat upholstery, were removed from the victim’s car, no hair or fluid evidence was recovered that matched the defendant’s.
When the victim testified at trial, she gave a detailed account of these events that was consistent with those recounted by her father, and by three of the police involved in the pursuit of Frazier. On cross-examination, Frazier vigorously challenged the victim’s account. Frazier elicited from the victim that at some point after the night of her abduction, she retraced the route she and Frazier had taken with law enforcement officers, and initially was unable to locate the dirt road on which the sexual assaults had taken place. Frazier’s counsel questioned the victim regarding the sexual assaults, asking her to recount, in detail, nearly a dozen sexual acts that occurred in the front of the vehicle, as well as in the back seat. Frazier elicited the fact that the victim had not mentioned that she had been sexually assaulted to the first doctor, a male, who examined her at the hospital. The victim also conceded that she had lit a cigarette for the defendant while they were in the car together.
On the evening after his arrest Frazier was questioned, and, after receiving Miranda[7] warnings, he gave an account of the previous evening that differed dramatically from the victim’s account. Frazier told an FBI agent interviewing him that he had been drinking beer all day, and “had á good buzz on” after consuming three twelve-packs. R7 at 211, 214. Frazier recounted that he was sitting on a bench outside the Wal-Mart, wearing a baseball hat that read “Official Booze Guz-' zling, Beer Chugging, Sud Sucking, Ass Kicking Party Cap,” id. at 218, when he was approached by the victim, a complete stranger, who initiated a conversation with him and offered to give him a ride back to his residence.
After he accepted the offer, according to Frazier, they began to drive around; when Frazier mentioned an ex-girlfriend in Silva, North Carolina, whom he wanted to visit, the victim offered to drive him there and he accepted. The defendant also told the FBI that the victim asked him to drive the car, even though he had consumed a large amount of alcohol and had told her that he did not have a valid driver’s license. Finally, Frazier said that he refused to pull over when chased by the victim’s father and the police only because the victim told him not to stop. According to Frazier, the victim told him not. to stop the car because if he did, her father “would beat his ass!” Id. at 217. There is no evidence that Frazier acknowledged to the FBI that he had swerved to hit or cut off either Kimsey or any of the police officers chasing him. Frazier denied that any sexual contact had occurred.
*1252 B.
Prior to trial, Frazier gave notice to the government that he intended to offer the expert testimony of Robert Tressel, a forensic investigator and former police officer. In essence, Tressel was prepared to testify that none of Frazier’s hairs or bodily fluids were recovered from the victim, her clothes or her car; that “it would be expected that some transfer of either hairs or seminal fluid would occur in this case,” Def. Ex. 2; and that “there is no forensic evidence to substantiate the claim of rape in this case.” Id. The object of this testimony and, indeed, the basic thrust of Frazier’s defense, was that the victim fabricated her account of kidnapping and rape in order to avoid being punished by her parents for violating her curfew. To establish this defense, Frazier hoped to undermine the credibility of the victim’s account of abduction and rape by, among other things, suggesting that she had lied about the sexual assaults.
The Government timely moved in li-mine to exclude Tressel’s testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and the district court conducted a thorough Daubert hearing before trial. At the hearing, Tressel testified that he had been a police officer in Cobb County, Georgia, for more than a decade. For ten years, Tressel worked as an investigator in Cobb County’s Crimes Against Persons Unit, which investigated homicides, rapes, other sexual assaults, and armed robberies. Tressel said that during his tenure in Cobb County he worked on thousands of cases, including between 150 and 250 sexual assault cases. In addition, he worked for thirteen years in the Cobb County Medical Examiner’s Office.
At the time he testified, Tressel was self-employed as a consultant in the area of forensic investigations. Tressel recounted the forensic training he had received, which included training in crime scene processing for his work with the Cobb County Police Department; additional education at the University of Georgia in crime scene analysis and processing; and “training at the University of Virginia through Quantico, the FBI laboratory, on crime scene processing.” R5 at 12. Tres-sel also stated that he had “been involved in criminalistic studies that were put on by the FBI at various law enforcement academies” in the state of Georgia, id., and explained that “the chief of police magazine that has sections on it where you can conduct kind of an at-home study program where you go through and you have to answer certain questions and everything. I have been involved in that.” Id. at 13. Tressel said that he had taught classes in crime scene investigation at the North Central Law Enforcement Academy and at the Northwest Georgia Law Enforcement Academy, and had qualified as an expert in various state and federal courts.
After presenting his general qualifications, Tressel opined that, based on all of the information that was available to him, it appeared that the forensic investigation of the alleged sexual assault had been performed properly and thoroughly. Tressel testified that he saw “no forensic evidence to substantiate the claim of rape in this case.” R5 at 25. Tressel offered the view that, given the allegations of sexual assault made by the victim, “[t]here should have been some transfer of either hairs, fibers or fluids between the victims [sic] in this case.” Id. at 27. Or, as he put it in his expert report, “[w]ith the amount of sexual activity described ... it would be expected that some transfer of either hairs or seminal fluid would occur.” Def. Ex. 2 at 2. Tressel also opined that, after reviewing the report of the victim’s medical examination, he concluded that the report *1253 ed conditions were consistent with the victim’s account that she had had sexual intercourse with her boyfriend on the day preceding the examination. Tressel explained that the victim’s condition would be consistent with either a sexual assault or the consensual sexual contact she described.
On cross-examination, the government sought to elicit from Tressel the foundation for his opinions. Tressel acknowledged, first, that as for his medical opinions, he had no training in performing medical examinations generally, or, specifically, in performing pelvic examinations of female sexual assault victims. Tressel conceded that he had no education, training or experience as a doctor, and that he was not a physician.
The government also questioned Tres-sel at some length concerning the bases for his opinions that hair was the most common form of forensic evidence found in rape investigations, and that “it would be expected that some transfer of either hairs or seminal fluid would occur.” Tressel said that he relied on his experience and a text entitled Practical Aspects of Rape Investigation, by Robert Hazel-wood and Ann Burgess, for the opinion that the transfer of hair is the form of forensic evidence most commonly found in rape investigations.[8] When asked to clarify what in his experience provided a more specific foundation for his general opinions, Tressel identified a single investigation he had worked on, in which hair evidence was recovered during the investigation of a serial rapist. He cited to no other case or investigation, and made no effort to quantify in any way the number of cases he was personally involved in that showed a transfer of hair or seminal fluid.
Tressel also observed that “I don’t think anybody has ever studied the rates of transfer” of hair evidence, and clarified that he was not familiar with any scientific literature on the rate of transfer of hair in sexual assault cases. R5 at 37. Tressel again cited his experience (albeit only as a general matter) and the Hazelwood and Burgess text as the foundation for his opinion that seminal fluid was frequently found in sexual assault cases.
The government.then explained the reasons underlying its motion to exclude Tressel’s opinions in these terms:
If you look back at what the witness stated, he says the forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs from the victim to the perpetrator and from the perpetrator to the victim.
There is no evidence placed before this court at this hearing as a basis for the admission of this evidence that a lack of hair eüdence found means necessarily that no séxual assault took place. There is no evidence that’s been placed before you that leads you, your Honor, to conclude that hair will be transferred in X percentage of cases....
All we have is there is no transfer here, and hair is the most commonly found piece of evidence during a rape investigation. No evidence that when he says it’s most commonly found, no evidence that that means that it’s found in 90 percent of the cases, 70 percent of the cases, 3 percent of the cases, and seminal fluid evidence is found in only two percent of the cases....
*1254 There is no evidence that routinely in a rape investigation you will have hairs transferred or hairs found. None. Nothing before the Court to that effect.
... Again, there is no evidence that a lack of seminal fluid present or found means necessarily that no sexual assault or sexual contact took place.
Id. at 44-46. The government argued that Tressel provided no foundation or support, either from the relevant literature or from his own experience, for his specific opinion that the recovery of hair or fluid evidence “would be expected” in a case like this one. The government also objected to Tressel’s proffered medical opinions based on the lack of any medical training and the fact that he had not personally examined the victim.
The district court ruled that Tressel was qualified to testify and could explain the standard procedures employed in investigating the crime scene of a sexual assault, that Tressel could recount that no hair or fluid matching Frazier’s was found on the scene, and that “the forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs.” Def. Ex. 2 at 2.[9] Conversely, however, the district court ruled that Tressel would not be permitted to opine that, based on the sexual activities described by the victim, “it would be expected that some transfer of either hairs or seminal fluid would occur.” Id. (emphasis added). Similarly, Tressel was not permitted to opine that the forensic evidence did not substantiate the rape claim, or that “there is no forensic evidence to substantiate the claim of rape.” Id.[10]
*1255 The district court excluded Tressel’s proffered opinions about the absence of hair and fluid evidence because it found the opinions to be unreliable. The trial court said that while Tressel was generally qualified as an expert forensic investigator,[11] he had not provided any specific basis — quantitative, empirical or otherwise — for his opinions. Precisely because Tressel could not specify in what percentage of cases hair or fluid evidence might reasonably be expected to be recovered, his opinion that the recovery of such evidence “would be expected” would mislead the jury. Simply put, there was no basis for assessing the reliability of Tressel’s opinion of what might reasonably be expected, or even its exact meaning.
The district court explained its decision in these terms:
[I]f there is any scientific evidence that shows that in 99 percent of the time you find pubic hair, I would have no problem with that, but he has no study. He just says that in a very nebulous statement that he used of — it wasn’t generally. It was commonly found.
Well, this may not be a commonly case. I have no problem with him saying that’s what they’re looking for, but I do have a problem with him saying that that’s what’s found, and if it’s not there, I don’t believe there was a rape, and I am not going to allow that....
If you have any scientific evidence that would indicate you should [find forensic evidence], I have no problem, as I said, with his testifying that’s what they look for, but when you start trying to prove that there is no case because they didn’t find it, you have got to have something more than just his opinion. You need something showing some study.
I have no idea whether — I don’t have enough to tell me how often that is, and I have no basis of knowing, and based upon what you’ve presented today, I would not and will not allow it. I don’t think that helps the jury....
At most, it’s a method of going to the credibility, and I hesitate to start trying to say that a witness is not credible because I would have expected some pubic hair to be found.
I don’t know what the percentage is. Are you going to say then there is a 50 percent chance she’s not credible, or there’s a 25 percent [chance] or there’s a 75 percent [chance] she’s not credible[?] I have difficulty with that, and I just *1256 don’t think that under those circumstances I would admit it.
R5 at 68-70.
The trial judge also excluded Tressel’s medical opinions because he was not qualified as a medical expert by background, training or experience. The court explained that it would allow a medical doctor to testify on the issue, but that Tres-sel’s experience and background were simply inadequate.
At trial, Frazier chose not to call Tressel at all, but did clearly establish that no seminal fluid or hair matching Frazier’s was recovered, during the investigation by calling two FBI laboratory technicians who had worked on the investigation. The defense first called Karen Lanning, an FBI hair and fiber examiner, who testified that she analyzed hair, clothing, and automobile upholstery collected during the Frazier investigation, and that none of the hairs recovered matched Frazier’s. On cross-examination, the government asked Lan-ning how often, in her experience, she found a transfer of hairs. The defense objected, observing that Lanning had been called only as a fact witness, and not as a general expert. The trial judge overruled the objection, after which Lanning testified that she found hair transfers in 10% of the cases she worked on, and found no hair 90% of the time. When the government attempted to question Lanning further about the significance of finding no hair in the case, the defense renewed its objection that Lanning had not been called as an expert. The district court agreed that she had been called as a fact witness and could not testify on cross-examination as to studies done on hair transfers, sustaining the objection'. The government observed that it would call her on rebuttal.
The defense also called Anthony Onora-to, a forensic DNA examiner in the FBI’s laboratory. Onorato explained that he had received evidence recovered in the Frazier investigation and tested it for the presence of bodily fluids, including blood and seminal fluid. Onorato was unable to identify any semen, nor was he able to identify any blood. On cross-examination, the government sought to question Onorato as to the frequency of finding evidence of semen. Frazier again objected, arguing that the government was seeking to use Onorato as an expert witness. The trial judge stated, “well, that’s a factual determination, I will allow that.” R9 at 359. Nevertheless, the government ceased this line of cross-examination, observing that it would call Onora-to on rebuttal “and do it all at once.” Id.
After the defense rested, the government announced that it would call Lanning and Onorato as rebuttal witnesses. Frazier objected, arguing only that the government had failed to give notice of its intent to use Lanning or‘ Onorato as expert witnesses, in violation of Rule 16 of the Federal Rules of Criminal Procedure. The defense suggested that, while the text of Rule 16 referred only to disclosure requirements for the government’s case-in-chief, calling these expert rebuttal witnesses without notice violated the spirit of the Rule. Frazier suggested, further, that it would be unfair to allow the government to call these experts to opine on the significance of the absence of hair or fluid evidence, since Frazier’s expert — Tressel— had been precluded from opining on the same subject.[12] Notably, the defense nev *1257 er objected to the government’s use of Lanning or Onorato on the grounds that either of them was not qualified as an expert, or that their opinions were based on methodologically unreliable or unsound foundations. The district court overruled the objection, reasoning that Rule 16 only requires notice when the government calls an expert during its case-in-chief, and here the witnesses plainly were called on rebuttal.
On rebuttal, Lanning recited her experience and qualifications, stating that she was a member of the Midwestern Association of Forensic Scientists and had testified as an expert forensic scientist more than one hundred times in state and federal courts across the country. Lanning had worked for six years in the Trace Evidence Unit of the FBI laboratory in Washington, D.C., after previously working for just under six years with the Kansas Bureau of Investigation. Lanning stated that she had never been rejected as an expert by any court, and the government proffered her as an “expert in the area of hair analysis” and forensic investigation, R9 at 369, without objection.
Lanning said that she was familiar with various scientific studies of the rate of hair transfer during sexual contact. She was familiar with a 1990 study by Mary Jacque Mann entitled “Hair Transfers in Sexual Assault” from the Journal of Forensic Sciences which found no pubic hair transfers to the victim’s underwear in 97% of the cases involved in the study; no pubic hair transfers in combings of the victim’s pubic hair in 96% of the cases; no head hair transfers in the victim’s underwear in 96% of the cases; no pubic hair transfers in the victim’s outer wear in 98.5% of the cases; and no head hair transfers in the victim’s outer wear in 97% of the cases. Lanning also said that she was familiar with a 1998 study in the same journal, entitled “Frequency of Pubic Hair Transfer During Sexual Intercourse,” which found no transfer of pubic hairs to the female partners in the study in 82.7% of the cases, and concluded that a failure to transfer pubic hair did not indicate that no intercourse had taken place. Consistent with the latter study, Lanning opined that the failure to recover any of Frazier’s hair did not necessarily mean that no sexual contact had taken place between Frazier and the victim.
On cross-examination, Lanning observed that if sexual contact occurred within an enclosed area, as opposed to an open space, it would be more likely that transferred hairs would remain in that area. She also said that the likelihood of a hair transfer might increase as the duration of the sexual encounter and range of activities increased. Lanning also clarified her earlier testimony that she found hair transfers in 10% of the cases she worked on, specifying that hair was only recovered in between 2% and 5% of the rape cases she worked on.
The government also called Onorato on rebuttal, and elicited that Onorato was a member of the American Academy of Forensic Sciences, the Canadian Society of Forensic Science, and the American Society of Clinical Pathologists. Onorato stated that he had testified as an expert in forensic serological analysis in approximately 15 courts, and was an expert in the search for the presence of semen on evidence. Onorato testified that he had a bachelor’s degree in biology and master’s degrees in clinical immunology and microbiology as well as in forensic science. Onorato worked for two years in the crime lab of the Pennsylvania State Police, and for approximately two years in the medical center of the University of Alabama at Birmingham, before spending approximately five years in the DNA Analysis Unit of the FBI. The government prof *1258 fered Onorato as an expert “in the search for the presence of semen on evidence” and forensic investigation, id. at 384, again without objection. Onorato testified that he found semen in materials present in 75% to 80% of the sexual assault cases he worked on. Onorato observed that in a sexual assault where the perpetrator did not ejaculate, the likelihood of recovering semen would be reduced. He also opined that the absence of a defendant’s sperm did not necessarily mean that no sexual contact took place.
On cross-examination, Onorato explained that in sexual assault cases where there were multiple erections and penetration over a period of time, the chances of recovering a chemical emitted by the prostate gland, P30, would be increased. Onorato observed that the likelihood of finding bodily fluids in the evidence he examined would increase with the number of sexual encounters.
Following Frazier’s trial, on June 20, 2001, the jury rejected his defense and returned a verdict of guilty. Soon thereafter, Frazier was sentenced to a term of life imprisonment without parole, pursuant to the federal “three-strikes” statute, 18 U.S.C. § 3559(c).[13] Frazier timely appealed on August 15, 2001.
A divided panel of this Court reversed Frazier’s conviction, holding that the district court abused its discretion in limiting the testimony of Robert Tressel. The majority found that the district court erroneously required scientific evidence as a prerequisite to expert status, and that by excluding portions of Tressel’s testimony it violated the defendant’s substantial rights because the heart of the defense turned on undermining the victim’s credibility. See United States v. Frazier, 322 F.3d 1262 (11th Cir.2003). Following the issuance of the panel’s opinion, on September 12, 2003, this Court entered an order vacating the panel opinion and directing that the case be heard en banc. See United States v. Frazier, 344 F.3d 1293 (11th Cir.2003) (en banc).
II.
We review for abuse of discretion the district court’s decisions regarding the admissibility of expert testimony and the reliability of an expert opinion. Joiner, 522 U.S. at 141-43, 118 S.Ct. at 517; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 142, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) (explaining that, under Joiner, “courts of appeals are to apply ‘abuse of discretion’ standard when reviewing district court’s reliability determination”). Indeed, the “deference that is the hallmark of abuse-of-discretion review,” Joiner, 522 U.S. at 143, 118 S.Ct. at 517, requires that we not reverse an evidentiary decision of a district court “ ‘unless the ruling is manifestly erroneous,’ ” id. at 142, 118 S.Ct. at 517 (quoting Spring Co. v. Edgar, 99 U.S. 645, 658, 25 L.Ed. 487 (1878)). Thus, it is by now axiomatic that a district court enjoys “considerable leeway” in making these determinations. *1259 Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176.
This Court has uniformly applied the deferential abuse-of-discretion review that Joiner mandates. See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir.2003) (trial court’s exclusion of expert testimony reviewed for abuse of discretion; “this standard of review requires that we defer to the district court’s evidentiary ruling unless that ruling is manifestly erroneous” (internal quotation marks and citations omitted)); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir.2002) (“[0]ur review of evidentiary rulings by trial courts on the admission of expert testimony is Very limited.’ ” (quoting Maiz v. Virani, 253 F.3d 641, 662 (11th Cir.2001))); Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 921 (11th Cir.1998) (“It is very much a matter of discretion with the trial court whether to permit the introduction of [expert] evidence, and we will not reverse the decision of the trial court regarding the exclusion or admission of such evidence unless the trial court’s decision is ‘manifestly erroneous.’ ”); see also Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1312 (11th Cir.2000) (“We review a trial court’s evidentiary rulings on the admission of expert witness testimony for abuse of discretion.”); United States v. Paul, 175 F.3d 906, 909 (11th Cir.1999) (“This court reviews the district court’s decision to exclude expert testimony under Federal Rule of Evidence 702 for abuse of discretion.”); United States v. Gilliard, 133 F.3d 809, 812 (11th Cir.1998) (“A district court’s decision to admit or exclude expert testimony under Rule 702 is reviewed for abuse of discretion.”).
The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach.
By definition ... under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review. As we have stated previously, the abuse of discretion standard allows “a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.”
Rasbury v. I.R.S. (In re Rasbury), 24 F.3d 159, 168 (11th Cir.1994) (quoting United States v. Kelly, 888 F.2d 732, 745 (11th Cir.1989) (citing Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir.1984))); see also Kern, 738 F.2d at 971 (“The very concept of discretion presupposes a zone of choice within which the trial courts may go either way.”). Thus, when employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard. Maiz, 253 F.3d at 662.
III.
A.
The starting point for our analysis is Rule 702 of the Federal Rules of Evidence, which controls the admission of expert testimony. It provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
*1260 As the Supreme Court made abundantly clear in Daubert, Rule 702 compels the district courts to perform the critical “ga-tekeeping” function concerning the admissibility of expert scientific evidence. 509 U.S. at 589 n. 7, 597, 113 S.Ct. at 2795 n. 7, 2798. The trial courts are also required to play the same gatekeeping function considering the admissibility of technical expert evidence. Kumho Tire, 526 U.S. at 147, 119 S.Ct. at 1174. This function “inherently require[s] the trial court to conduct an exacting analysis” of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. McCorvey, 298 F.3d at 1257.
The importance of Daubert’s ga-tekeeping requirement cannot be overstated. As the Supreme Court framed it in Kumho Tire: “[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” 526 U.S. at 152, 119 S.Ct. at 1176. The district court’s role is especially significant since the expert’s opinion “can be both powerful and quite misleading because of the difficulty in evaluating it.” Daubert, 509 U.S. at 595, 113 S.Ct. at 2798 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991) (‘Weinstein”)). Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are “of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.” Fed.R.Evid. 703.
Thus, it comes as no surprise that in determining the admissibility of expert testimony under Rule 702, we engage in a rigorous three-part inquiry. Trial courts must consider whether:
(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.
City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir.1998) (citing Daubert, 509 U.S. at 589, 113 S.Ct. at 2794). While there is inevitably some overlap among the basic requirements— qualification, reliability, and helpfulness— they remain distinct concepts and the courts must take care not to conflate them. Quiet Tech., 326 F.3d at 1341.
The proponent of expert testimony always bears “the burden to show that his expert is ‘qualified to testify competently regarding the matters he intended] to address; [] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact.’” McCorvey, 298 F.3d 1253, 1257 (alterations in original) (quoting Maiz, 253 F.3d at 664). The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.
Turning first to the qualification of the expert, we observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field *1261 may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on “knowledge, skill, experience, training, or education.” (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that “[njothing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony.” Fed.R.Evid. 702 advisory committee’s note (2000 amends.).
Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in Quiet Technology, “while an expert’s overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability.... [0]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony.” 326 F.3d at 1341-42. Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility.
Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, “[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court’s gatekeeping function requires more than simply ‘taking the expert’s word for it.’ ” Fed.R.Evid. 702 advisory committee’s note (2000 amends.) (emphasis added); see also Daubert v. Merrell Dow Pharmaceuticals, Inc. (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that “the expert’s bald assurance of validity is not enough”). If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.
Thus, it remains a basic foundation for admissibility that “[proposed [expert] testimony must be supported by appropriate validation — i.e., ‘good grounds,’ based on what is known.” Daubert, 509 U.S. at 590, 113 S.Ct. at 2795. As the Supreme Court put it, “the Rules of Evidence — especially Rule 702 — ... assign to the trial judge the task of ensuring that an expert’s testimony ... rests on a reliable foundation.” Id. at 597, 113 S.Ct. at 2799.
When evaluating the reliability of scientific[14] expert opinion, the trial *1262 judge must assess “whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue.” Id. at 592-93, 113 S.Ct. at 2796. To evaluate the reliability of scientific expert opinion, we consider, to the extent practicable:
(1) whether the expert’s theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.
Quiet Tech., 326 F.3d at 1341 (citing McCorvey, 298 F.3d at 1256 (citing Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97)). These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. See Kumho Tire, 526 U.S. at 150-152, 119 S.Ct. at 1175-76; Fed.R.Evid. 702 advisory committee’s note (2000 amends.); see also Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir.1999) (“[N]ot only must each stage of the expert’s testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.”).
The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176; see also Clark v. Takata Corp., 192 F.3d 750, 758 (7th Cir.1999) (“In determining whether an expert’s testimony is reliable, the Daubert factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on ‘experience’ or ‘training.’ ”). As the Supreme Court explained in Kumho Tire:
In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert’s experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.
526 U.S. at 151, 119 S.Ct. at 1176. Sometimes the specific Daubert factors will aid in determining reliability; sometimes other questions may be more useful. As a result, “the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.” Id. at 152, 119 S.Ct. at 1176. Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial. See Fed. R.Evid. 702 advisory committee’s note (2000 amends.) (“The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.” (emphasis added)).
The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. See United States v. Rouco, 765 F.2d 983, 995 (11th Cir.1985) (expert testimony admissible if it offers something “beyond the understanding and experience of the average citizen”). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in *1263 closing arguments. See 4 Weinstein’s Federal Evidence § 702.03[2][a].
Because of the powerful and potentially misleading effect of expert evidence, see Daubert, 509 U.S. at 595, 113 S.Ct. at 2798, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403.[15] Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, see Rouco, 765 F.2d at 995, or if the expert testimony is cumulative or needlessly time consuming. See, e.g., Hull v. Merck & Co., Inc., 758 F.2d 1474, 1477 (11th Cir.1985) (per curiam) (finding that admission of speculative and “potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702”); see also United States v. Stevens, 935 F.2d 1380, 1399 (3d Cir.1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of “undue delay, waste of time, or needless presentation of cumulative evidence”). Indeed, “the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses.” Weinstein, 138 F.R.D. at 632; see also Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.
B.
The application of these basic principles yields the conclusion that the district court did not abuse its discretion (that is, commit manifest error) in excluding certain portions of Tressel’s proposed expert testimony.
We begin by observing that the first requirement, qualification, is satisfied here. Based on his training and experience as a forensic investigator, Tressel was qualified as an expert in forensic investigations. In fact, the trial judge acknowledged as much during the Daubert hearing. The district court said: “I think that he’s an expert in what you normally look for [in a rape investigation], and I don’t have any difficulty with that. That’s where his area of expertise is.” R5 at 51. Later, the trial judge reiterated this point, observing: “I have no problems with his expertise as he is obviously a very qualified criminal investigator.... [I]f here we were dealing with procedures that were used and whether they were adequate or inadequate, then I would consider him a good expert to testify to those matters.” Id. at 66. Tressel’s qualification as an expert forensic investigator was based on his experience with the Police Department of Cobb County, Georgia, and within the Cobb County Medical Examiner’s Office. Were Tressel’s qualification as an expert the only prerequisite to the admissibility of all his opinion testimony, we have little doubt that he would be competent to testify generally as an expert forensic investigator.[16]
*1264 Frazier argues, however, that the district court erroneously treated scientific background as a prerequisite to expert status, and we agree that, had the court done so, it would have erred as a matter of law, because Rule 702 expressly contemplates that experts may be qualified based on experience. However, our review of the entire record suggests that the district court excluded Tressel’s testimony not because he lacked a scientific background, but because he failed to establish that his opinions were methodologically reliable or sound. ■
Two factors support our conclusion that the district court did not exclude Tressel’s testimony because he lacked scientific expertise or was otherwise unqualified. First, as we have noted, the trial court explicitly said that Tressel was qualified by experience as an expert forensic investigator. Second, the district court allowed FBI investigators Lanning and Onorato to offer expert opinions after they were qualified as experts based in substantial measure on their experience.[17] The record taken as a whole indicates that the district court properly, understood that experience can provide a basis for qualifying an expert. And we discern no abuse of discretion in the district court’s conclusion that Tressel was a qualified forensic investigator.
We turn then to the central issue on appeal: whether the district court abused its discretion by excluding some of Tres-sel’s opinion testimony because he failed to establish its reliability. We reiterate that the district court has the same broad discretion in deciding how to assess the reliability of expert testimony that it has in its ultimate reliability determination. In this case, after the government moved to exclude Tressel’s testimony, the district court assessed the reliability of his opinions by conducting a thorough Daubert hearing in which Tressel was asked, repeatedly, what the bases for his opinions were. While some expert testimony will be so clearly admissible that a district court need not conduct a Daubert hearing in every, case, see Kumho Tire, 526 U.S. at 150-52, 119 S.Ct. at 1175-76, in this case, the district court’s decision to evaluate the admissibility of Tressel’s opinions in the context of a pre-trial hearing was a perfectly reasonable one. Moreover, Frazier has not attacked the timing or conduct of the Daubert hearing. And the record amply establishes that Frazier was afforded every opportunity at the hearing to adduce the foundations of Tressel’s challenged opinions. The district court did not abuse its discretion when it conducted a Daubert hearing.
The reliability of Tressel’s opinion that the recovery of inculpatory hair or seminal *1265 fluid “would be expected” is undermined in two ways. First, the very meaning of his basic opinion is uncertain. Whether Tres-sel opined that “expect,” as he used the term, meant that it was more likely than not that trace evidence would be found, or that it was substantially more likely than not that it would be found if there was a sexual assault, or that discovery was a virtual certainty, is altogether unclear from Tressel’s report or his testimony. The specific meaning of the opinion is impossible to discern. As the government pointed out at oral argument, even the dictionary definition of the term “expect” — meaning to consider something either likely or certain — is itself ambiguous, and could imply a likelihood anywhere between 50% and 100%. See Webster’s Third International Dictionary 799 (1961) (defining “expect” as “to consider probable or certain”).
More fundamentally, even if we take Tressel’s opinion to mean simply that it was more likely than not that hair or seminal fluid would be transferred, and therefore recovered, Tressel offered precious little in the way of a reliable foundation or basis for his opinion. After the government moved to exclude Tressel’s expert testimony, the district court was obliged to exercise its gatekeeping role by determining whether Tressel provided a reliable foundation or basis for his opinion. When questioned specifically about the basis for his opinion, Tressel said his opinion was based on his experience, and on various texts in forensic investigation. However, even after repeated prompting, Tressel never explained just how his own experience, or the texts he mentioned, supported his “expectancy” opinion. Indeed, Tressel identified only a single investigation he had worked on in which hair evidence was recovered during the investigation of a serial rapist, and could suggest no study that had ever examined the rate of transfer of hair in sexual assault cases.
While the expert’s statement that the recovery of hair or seminal fluid “would be expected” expresses an intrinsically probabilistic or quantitative idea, the probability it expresses is unclear, imprecise and ill-defined. And the basis for that probabilistic opinion is left unstated. Without knowing how frequently hair or seminal fluid is transferred during sexual conduct in similar cases — whether derived from reliable studies or based on some quantification derived from his own experience — it would be very difficult indeed for the district court (or for that matter the jury) to make even an informed assessment, let alone to verify that the recovery of hair or fluid evidence in this case “would be expected.” Nor could the district court tell from Tres-sel’s testimony whether his opinions had been subjected to peer review or, even, the percentage of cases in which his opinion had been erroneous. Simply put, Tressel did not offer any hard information concerning the rates of transfer of hair or fluids during sexual conduct.
Since Tressel was relying solely or primarily on his experience, it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case. Again, “[t]he court’s gatekeeping function requires more than simply ‘taking the expert’s word for it.’ ” Fed.R.Evid. 702 advisory committee’s note (2000 amends.).
Our review of this record leads us to the conclusion that the district court did not abuse its discretion in finding the absence of a sufficiently verifiable, quantitative basis for Tressel’s opinion.[18] As we have *1266 noted, the application of an abuse-of-discretion standard recognizes a range of possible conclusions that the trial judge may reach. In this case, we are satisfied that the district judge acted well within that range in finding an insufficient nexus between the experience proffered by the expert and the essential opinion propounded.
Turning finally to the third requirement for admissibility of expert opinion testimony — whether it will assist the trier of fact in understanding the evidence — the district court also concluded that Tressel’s opinion regarding “expectation” would not aid the jury.[19] Again, because Tressel’s opinion was imprecise and unspecific, the members of the jury could not readily determine whether the “expectation” of finding hair or seminal fluid was a virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a possibility. As a result, Tressel’s imprecise opinion easily could serve to confuse the jury, and might well have misled it. More importantly, as we have noted, the methodological foundation or reliability of Tressel’s “expectancy” opinion ,was sufficiently slender,to allow the district court to conclude that the trier of fact would not be assisted by the opinion. In short, we can discern no abuse of discretion (let alone manifest error) in the trial court’s finding that the third prong of Rule 702 had not been met either.[20]
*1268 IV.
A.
Frazier also claims that the' district court’s decision to permit the téstimony of FBI investigators Lanning and Onorato— while at the same time excluding some of Tressel’s opinion — was a fatal error. We remain unpersuaded.
Frazier makes three broad arguments in support of this claim. First, he says that the government’s failure to provide notice of its intent to call Lanning and Onorato violated the spirit and purpose of Rule 16 of the Federal Rules of Criminal Procedure. Next, Frazier suggests that it was improper for the district court to allow the government to use Lanning and Onorato as rebuttal witnesses. Having excluded Tressel’s testimony, Frazier argues, there was nothing for Lanning and Onorato to rebut. Finally, Frazier maintains that it was simply unfair to allow the government to present evidence — through Lanning and Onorato — on the very issue on which he was unable to offer evidence from- Tres-sel.[21]
*1269 At trial, Frazier’s primary objection was that, absent notice, allowing the testimony of Lanning and Onorato violated Rule 16 of the Federal Rules of Criminal Procedure. The pertinent portion of Rule 16 provides:
At the defendant’s request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.
Fed.R.Crim.P. 16(a)(1)(G) (emphasis added). Our case law establishes that, consistent with the plain language of the Rule, the government’s presentation of rebuttal testimony without prior notice does not violate Rule 16, since the Rule’s notice requirements apply only to the government’s case-in-chief. See United States v. Windham, 489 F.2d 1389, 1392 (5th Cir. 1974) (“Rebuttal witnesses are a recognized exception to all witness disclosure requirements.”);[22] see also United States v. DiCarlantonio, 870 F.2d 1058, 1063 (6th Cir.1989) (Rule 16 does not require disclosure of expert rebuttal testimony not offered during government’s case-in-chief); United States v. Barrett, 766 F.2d 609, 617 (1st Cir.1985) (same); United States v. Angelini, 607 F.2d 1305, 1308-09 (9th Cir. 1979) (same). Thus, so long as this testimony was properly characterized as rebuttal, Rule 16 did not require the government to give' notice or a summary of the testimony.
Frazier argues, nevertheless, that the testimony of Lanning or Onorato is not rebuttal because Tressel’s testimony was excluded and, thus, there were no opinions for them to contradict. We disagree. We have explained that “[t]he purpose of rebuttal evidence is ‘to explain, repel, counteract, or disprove the evidence of the adverse party,’ and the decision to permit rebuttal testimony is one that resides in the sound discretion of the trial judge.” United States v. Gold, 743 F.2d 800, 818 (11th Cir.1984) (quoting United States v. Delk, 586 F.2d 513, 516 (5th Cir.1978)); see also Luttrell v. United States, 320 F.2d 462, 464 (5th Cir.1963) (“ ‘It is within the distinct office of rebuttal to explain, repel, counteract, or disprove the evidence of the adverse party.’ ” (quoting Shepard v. United States, 64 F.2d 641, 642 (10th Cir. 1933))).
During his case-in-chief, Frazier’s counsel called Lanning and Onorato (instead of Tressel) in order to establish that no hair or fluids matching Frazier’s were found at the scene of the crime, after suggesting in opening statement that the absence of this evidence meant that no sexual assault had taken place, and therefore that the victim’s accounts of abduction and assault were not credible.[23] The government offered the *1270 rebuttal testimony of Lanning and Onorato to explain and attempt to counteract the viewpoint that the absence of finding hair or seminal fluid meant no sexual assault had occurred.
We add that by introducing the fact that the investigators had failed to recover any inculpatory hairs or bodily fluids, and arguing the significance of that failure, Frazier plainly opened the door for the government to offer reliable evidence that could help explain the significance of that failure. He cannot now complain that the government stepped through that door and rose to the challenge he presented. See United States v. Hall, 653 F.2d 1002, 1006 (5th Cir. Unit A Aug.1981) (“The underlying rationale [of rebuttal evidence] is that when the defendant has opened the door to a line of testimony by presenting evidence thereon, he cannot object to the prosecution’s accepting the challenge and attempting to rebut the proposition asserted.” (citing Delk, 586 F.2d at 516)). This was the purpose animating the government’s use of Lanning’s and Onorato’s testimony, and the district court did not abuse its discretion in allowing the testimony of Lanning and Onorato on rebuttal. No violation of Rule 16 has been established on this record.
Frazier also argues that, regardless of whether there was any violation of the terms of Rule 16, it was unfair to allow Lanning and Onorato to testify because Tressel was not permitted to testify on the same point. Frazier says that if the government was allowed to present evidence on an issue, he too should have been afforded the same opportunity to do so. Frazier relies on United States v. Gaskell, 985 F.2d 1056 (11th Cir.1993) for the proposition that a district court may abuse its discretion when it excludes one party’s testimony on a critical issue while allowing the other party to present evidence on the same issue.
Gaskell is inapposite and Frazier’s reliance upon it is misplaced. In Gaskell, a panel of this Court ruled that the district court erred by excluding the expert testimony of one party while allowing the other party to present expert testimony on the same issue. However, in Gaskell, the district court’s reason for excluding the testimony was the lack of relevance. We held that if testimony for one party was relevant, testimony for the other party on the same issue would be relevant and, if otherwise admissible, should not be excluded. See Gaskell, 985 F.2d at 1063 (“Any doubt as to the relevance of this evidence should have been resolved in favor of Gaskell in light of the fact that the government’s expert was allowed to opine [on the same subject]. ‘It is an abuse of discretion to exclude the otherwise admissible opinion of a party’s expert on a critical issue, while allowing the opinion of his adversary’s expert on the same issue.’ ” (quoting United States v. Lankford, 955 F.2d 1545, 1552 (11th Cir.1992) (emphasis added))).
Here, however, the government has not disputed that Tressel’s testimony was relevant; rather, it objected and the district court ruled that some of Tressel’s opinion testimony was not reliable, and for that reason inadmissible. Because the district court did not abuse its discretion in finding the opinion unreliable, Gaskell does not illuminate this case.
*1271 B.
Nor are we persuaded by Frazier’s broader claim that the aggregate effect of the district court’s evidentiary rulings was to deny him “a meaningful opportunity to present a complete defense.” California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984).
It is surely true that a defendant must be afforded the opportunity to present a defense. Indeed, the right of the accused to assert a complete defense is well established, and has its roots in the Fifth, Sixth, and Fourteenth Amendments to the Constitution. The Supreme Court has explained:
Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard.
Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146-7, 90 L.Ed.2d 636 (1986) (internal quotation marks and citations omitted). As the Court observed in Chambers v. Mississippi: “[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.” 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973).
While the Constitution unquestionably provides a defendant with the right to be heard, this right is not unbounded. Thus, “[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.” Taylor v. Illinois, 484 U.S. 400, 410, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 (1988). A trial would not be considered unfair because the defendant was prevented from offering perjured testimony. See Nix v. Whiteside, 475 U.S. 157, 173, 106 S.Ct. 988, 997, 89 L.Ed.2d 123 (1986) (“Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying falsely.”)-, Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). Nor are an accused’s constitutional rights necessarily violated because he was prevented from introducing hearsay, see United States v. Pena, 527 F.2d 1356, 1362 (5th Cir.1976), or from presenting otherwise relevant evidence that is privileged, such as communications between a doctor and patient, a lawyer and client, or between a husband and wife, see United States v. Brown, 634 F.2d 819, 830 (5th Cir.1981) (“The district court did not violate either [the defendant’s] Sixth Amendment right to confront the witnesses against him or his Fifth Amendment right to due process of law when it upheld [the] claim of marital privilege as a bar to the ... testimony.”). And courts may constitutionally preclude defendants from offering otherwise relevant evidence if they fail to comply with procedural rules that require notice to be given. See Michigan v. Lucas, 500 U.S. 145, 152-53, 111 S.Ct. 1743, 1748, 114 L.Ed.2d 205 (1991); Taylor, 484 U.S. at 417, 108 S.Ct. at 657. Thus, for example, a district court may constitutionally preclude an accused from calling an alibi witness if he has failed to disclose the witness, as required under Rule 12.1 of the Federal Rules of Criminal Procedure. See, e.g., Williams v. Florida, 399 U.S. 78, 81-82, 90 S.Ct. 1893, 1896, 26 L.Ed.2d 446 (1970) (finding analogous state notice-of-alibi rule constitutional).
As the Supreme Court observed in Chambers, the accused, just like the state, “must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.” *1272 410 U.S. at 302, 93 S.Ct. at 1049; see also Crane, 476 U.S. at 690, 106 S.Ct. at 2146; United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998); Rock v. Arkansas, 483 U.S. 44, 55-56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987).
A policy which aims at preventing the use of unreliable or misleading expert evidence in criminal trials is far from arbitrary. Accordingly, a court may constitutionally enforce evidentiary rules to limit the evidence an accused (or for that matter any party) may present in order to ensure that only reliable opinion evidence is admitted at trial. “The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth.” United States v. Nobles, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975); see also United States v. Nixon, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) (“The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.”).
While the Federal Rules of Evidence — notably Rule 702 — aim to ensure that the fact-finder weighs only sound and reliable evidence, it is also worth repeating that a district court’s exercise of its gatekeeping responsibilities must not “supplant the adversary system or the role of the jury.” Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311 (11th Cir.1999); see also United States v. 1J/..38 Acres of Land, More or Less Situated in Leflore County, Miss., 80 F.3d 1074, 1078 (5th Cir.1996) (“[T]he trial court’s role as gatekeeper is not intended to serve as a replacement for the adversary system.... ”). As the ultimate fact-finder, it is the jury that must determine, finally, where the truth in any case lies, and the district judge as gatekeeper may not usurp this function. See Fed.R.Evid. 102 (“These rules shall be construed ... to the end that the truth may be ascertained and proceedings justly determined.”); Nix, 475 U.S. at 171, 106 S.Ct. at 996 (explaining that “governance of trial conduct” should aim at “what we have long called ‘a search for truth’ ”). However, the trial judge’s role as gatekeeper is designed to ensure that the jury, in carrying out its prescribed role, bases its determinations on relevant and rehable evidence, rather than on speculation or otherwise unreliable conjecture. These bedrock principles establish that, while a criminal defendant must be given every meaningful opportunity to present a complete defense, in doing so he must comply with the procedural and evidentiary rules designed to facilitate a search for the truth.
Turning to the case at hand, Frazier’s right to put on a meaningful defense did not include the unfettered and unreviewable opportunity to present all expert opinion, even if it did not meet the basic requirements for admissibility found in Rule 702. See Taylor, 484 U.S. at 410-11, 108 S.Ct. at 653-54. And we have found that the district court acted well within its discretion in excluding some of Tressel’s opinions.
Moreover, Frazier’s view that the exclusion of Tressel’s testimony denied him a fundamentally fair trial must also fail because, as we’ve noted, the essence of Tres-sel’s proposed testimony was admitted at trial through alternative means. The basis for Tressel’s expectancy opinion — that no transferred hair or fluid evidence inculpating Frazier in the sexual assault was recovered — was actually admitted at trial *1273 through the testimony of FBI examiners Lanning and Onorato. Tressel’s opinion that the recovery of hair or semen would be expected was argued vigorously to the jury by Frazier’s counsel, who contended that the lack of evidence suggested the victim’s story of rape had been manufactured, and maintained that if the victim’s account of the sexual assault could not be believed, then the jury could not believe her statement that she was kidnapped as well.
In short, the district court’s exclusion of some portions of Tressel’s opinion testimony did not prevent Frazier from introducing the key elements of his defense and placing his story before the jury. See Sheffield, 992 F.2d at 1170.
V.
After painstaking review of this record we are satisfied that the district court did not abuse its discretion, that is commit manifest error, in excluding a portion of Tressel’s opinion testimony while allowing the government’s rebuttal evidence on the same issue. Nor, finally, was this defendant denied a fair trial. Accordingly, we affirm.
AFFIRMED.

. The kidnapping statute, 18 U.S.C. § 1201, provides in pertinent part:
(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries *1249 away and holds for ransom or reward or otherwise any person, except in .the case of a minor by the parent thereof, when—
(1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began;
shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.
18U.S.C. § 1201(a).

. The indictment alleged, specifically, that Frazier had been previously convicted of the following ?erious violent felonies:
1974 — #9519—Armed Robbery — Gwinnett County Superior Court, Lawrenceville, Georgia;
1974 — # 43674 — Robbery—Hall County Superior Court, Gainesville, Georgia;
1979 — #K-45837 and K-45838 — Robbery . by Force — Hall County Superior Court, Gainesville, Georgia;
1980 — # 11684 — Armed Robbery — Houston County Superior Court, Perry, Georgia;
1980 — # 80R-23 — Aggravated Assault— Crisp County Superior Court, Cordele, , Georgia;
1993 — # 93-CR-94-S — Aggravated Assault — Habersham County Superior Court, Clarkesville, Georgia.

. A surveillance video camera trained on the Wal-Mart parking lot was played for the jury at trial. The video tape showed the victim walking alone toward her vehicle and approaching the driver’s side of the car. The tape also revealed Frazier’s approach, coming from behind the victim, and showed Frazier and the victim standing on the driver's side before entering the car. However, the video tape view was partially obscured, Frazier’s hands were not visible, and the video did not show the knife.

. An in-store video surveillance camera in the Circle-K captured Frazier and the victim in that convenience store, and was played for the jury. The videotape showed the two entering the store and purchasing cigarettes. On the videotape, the victim was not visibly restrained by Frazier, and the store clerk testified that the victim did not seem noticeably upset or distressed, nor was it readily apparent that she was being directed by Frazier.

. At trial, consistent accounts of the defendant's flight from police were given by the victim, Kimsey, and three of the officers involved in the chase: Shawn Wilson, a deputy sheriff with the Rabun County Sheriff’s Department, Sergeant Terry Smith of the Macon County Sheriff's Department, and Donald Willis, a deputy sheriff with the Macon County Sheriff's office. In addition, videotapes recorded by video equipment in the vehicles of Sergeant Smith and Deputy Sheriff Willis were played at trial, and reinforced the officers’ accounts.

. The nurse did not offer an opinion regarding the cause of this bruising to the cervix, stating only that the injury was not caused by the automobile accident.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Frazier did not proffer this or any other text into evidence to support Tressel's opinions. Tressel also said that he relied on. another text, "Crime Scene Search and Physical Evidence Handbook, by Carl Cunningham,” R5 at 37, which was not offered into evidence. See Richard H. Fox & Carl L. Cunningham, Crime Scene Search and Physical Evidence Handbook (U.S. Dept, of Justice 1973).

. Specifically, the district court ruled that Tressel could offer the following testimony based on these paragraphs taken from his expert report:
[A] thorough examination of the motor vehicle was performed by [the] Evidence Recovery Team.
... [T]he laboratory was unable to find any transfer of any head or pubic hairs from the suspect, Richard Frazier, to the body of [the victim], or to the interior of the vehicle.
... All [tests] were negative for seminal fluid [and for blood],
... During the course of a rape investigation, it is an investigator’s responsibility to collect all pertinent evidence that can be of assistance in determining whether or not an alleged sexual assault has occurred. It is the duty of the investigator to substantiate the alleged claim of sexual assault, whether it be rape or sodomy charges, through the collection of forensic evidence.
The forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs from the victim to the perpetrator and from the perpetrator to the victim. These hairs are routinely pubic hairs that become transferred during sexual intercourse. Head hairs can also be transferred during a sexual assault and can be found in the clothing of both the victim and the perpetrator.
Seminal fluids are frequently found in sexual assault cases, especially when multiple episodes of sexual activity occur and no condom is used by the perpetrator. These fluids can be found not only in the orifices of the victim, but also on the clothing worn by both the victim and the perpetrator.
In review of the documents that I have been provided on this case, it appears that a thorough forensic investigation and a thorough rape examination of the victim in this case were performed.
Def. Ex. 2 at 2.

. Specifically, the trial judge ruled that Tres-sel could not offer testimony based on the following paragraphs of his expert report:
With the amount of sexual activity described in the search warrant affidavit, it would be expected that some transfer of either hairs or seminal fluid would occur in this case.
The resulting laboratory findings in this case, do not substantiate the claim of rape through forensic evidence. All findings of the samples that were taken, all of which are essentially routine rape investigation *1255 procedures, were negative in finding a transfer of seminal fluid or hair from the defendant in this case. The medical examination of the victim only shows evidence of sexual activity on the part of the victim at some time prior to the examination taking place. The documented finding of bruising around the labia major indicates that the bruising may be substantially older than only a few hours.
Based on my review of the available documents, it is my professional opinion that there is no forensic evidence to substantiate the claim of rape in this case. The only indication that any type of sexual activity occurred is the redness around the labia major and the redness of the cervix. These two injuries, in and of themselves, can occur during routine normal sexual activity. [The victim’s] medical records indicate that she had sexual intercourse on 10/29/2000.
Def. Ex. 2 at 2-3.

. The district court explained:
I think that he’s an expert in what you normally look for, and I don’t have any difficulty with that. That's where his area of expertise is.
I have no problems with his expertise as he is obviously a very qualified criminal investigator, and as to investigative procedures, but that's not the — if here we were dealing with procedures that were used and whether they were adequate or inadequate, then I would consider him a good expert to testify to those matters.
R5 at 51, 66.

. Frazier objected in the following terms:
Your honor, I think that it’s just wholly unfair for the government to attempt to use these witnesses that I’ve called as fact witnesses who were under their control' — Now, the Rule does say in their case in chief, but here I think that what the government is doing is playing games to avoid [the rule]— to sandbag the defendants, [sic]
R9 at 359-60.

. 18 U.S.C. § 3559(c) provides:
(1) Mandatory life imprisonment. — Notwithstanding any other provision of law, a person who is convicted in a court of the United States of a serious violent felony shall be sentenced to life imprisonment if—
(A) the person has been convicted (and those convictions have become final) on separate prior occasions in a court of the United States or of a State of—
(i) 2 or more serious violent felonies; or
(ii) one or more serious violent felonies and one or more serious drug offenses; and
(B) each serious violent felony or serious drug offense used as a basis for sentencing under this subsection, other than the first, was committed after the defendant’s conviction of the preceding serious violent felony or serious drug offense.
18 U.S.C. § 3559(c)(1).

. In Daubert, the Court noted that "[s]cience is not an encyclopedic body of knowledge about the universe. Instead, it represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement.... [I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.” 509 U.S. at 590, 113 S.Ct. at 2795 (internal quotation marks and citation omitted). ”[S]cience is a process, a way of examining the natural world and discovering important truths about it. In short, the essence of science is the scientific method.” David Goodstein, "How Science Works,” Reference Manual on Scientific Evidence 69 (Federal Judicial Center, 2d ed.2000).
Scientific evidence encompasses so-called hard sciences (such as physics, chemistry, mathematics and biology) as well as soft sciences (such as economics, psychology, and sociology), and it may be offered by persons with scientific, technical, or other specialized knowledge whose skill, experience, training, or education may assist the trier of fact in understanding the evidence or determining a fact in issue.
William W. Schwarzer & Joe S. Cecil, "Management of Expert Evidence,” Reference Manual on Scientific Evidence 39 (Federal Judicial Center, 2d ed.2000).

. Federal Rule of Evidence 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Fed.R.Evid. 403.

. While the district court found Tressel qualified as an expert forensic investigator, it reached the opposite conclusion concerning his qualification to offer medical opinions. The trial judge said that 'T am not going to allow him to testify about the bruising [to the *1264 victim's genital area]. I would [allow] a medical doctor but not a witness with these credentials.” R5 at 50-51. Frazier does not appeal the district court's .ruling that Tressel was not qualified to offer expert medical testimony. We add that evidence of bruising to genitalia, just like hair and bodily fluids, may be forensic evidence of a sexual assault.

. As detailed supra, Lanning had worked for just under six years with the Kansas Bureau , of Investigation, and for six years in the Trace Evidence Unit of the FBI laboratory in Washington, D.C.; she was a member of the Midwestern Association of Forensic Scientists and had testified as an expert forensic scientist more than a hundred times. Onorato had worked in the University of Alabama at Birmingham's medical center for approximately two years, and in the crime lab of the Pennsylvania State Police for two years, before joining the FBI, where he had worked for approximately five years at the time of the trial. Onorato also had experience as a member of the American Academy of Forensic Sciences, the Canadian Society of Forensic Science, and the American Society of Clinical Pathologists, and qualified as a court expert in approximately 15 cases.

. Tressel’s other opinion — that there was no forensic evidence to substantiate the rape— plainly was premised on his basic opinion *1266 that "it would be expected that some transfer" of haiir or seminal fluid would occur in this case. Accordingly, if the district court did not abuse its discretion, that is, commit manifest error, in excluding the opinion concerning "expectancy,” then it did not (nor on this record could it) commit manifest error in excluding the derivative opinion either.

. We read the record to suggest that the district court concluded Tressel's ambiguous "expectation" opinion would not aid the jury, although the court's statements are, on this point, not altogether clear. The court said:
I have no problem, as I said, with his testifying that's what they look for, but when you start trying to prove that there is no case because they didn’t find [trace evidence], you have got to have something more than just his opinion....
I have no idea whether — I don't have enough to tell me how often that is, and I have no basis of knowing, and based upon what you’ve presented today,, I would not and will not allow it. I don’t think that helps the jury.
R5 at 69 (emphasis added).

. Moreover, even if the district court had abused its discretion in excluding portions of Tressel's opinion testimony- — and on this record we find no abuse of discretion — any such error would have been harmless.
Evidentiary decisions do not constitute reversible error "unless a substantial right of the party is affected,” Fed.R.Evid. 103(a), and errors that do not "affect substantial' rights must be disregarded.” Fed.R.Crim.P. 52(a). In a case involving non-constitutional eviden-tiary errors, we read these rules of evidence and criminal procedure along with the federal harmless-error statute, 28 U.S.C. § 2111, which requires that "the court shall give judgment after an examination' óf the record without regard to errors or defects which do not affect the substantial rights of the parties.” See United States v. Guzman, 167 F.3d 1350, 1353 (ilth Cir.1999); United States v. Hernandez, 160 F.3d 661, 670 (11th Cir.1998); United States v. Lankford, 955 F.2d 1545, 1556 (11th Cir.1992); United States v. Sellers, 906 F.2d 597, .601 (11th Cir.1990). Errors do affect a substantial right of a party if they have a "substantial influence” on the outcome of a case or leave "grave doubt” as to whether they affected the outcome of a case. Kot-teakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct.. 1239, 1248, 90 L.Ed. 1557 (1946). The exclusion of a portion of Tressel’s opinion testimony, even if erroneous, did not affect Frazier's substantial rights.
As we’ve repeated, the substance of the excluded portions of Tressel's testimony was presented to the jury through the testimony of other witnesses. Frazier argued vigorously that the lack of hair and fluid evidence meant that there had been no rape and therefore no abduction. We reiterate that the district . court did not exclude all of Tressel's testimony. Indeed, it allowed him to testify that a thorough investigation was performed; that no inculpatory evidence was recovered; that hair is the evidence "most commonly found” in rape investigations; and that seminal fluids *1267 are “frequently found in sexual assault cases,” especially when (as in this case) there is a claim that multiple episodes of sexual activity occurred and no condom was used. Whatever impact the failure to present this evidence through Tressel had on the outcome of the trial, Frazier cannot now complain that his rights were violated, since it was his decision, not a ruling by the trial judge, that kept Tressel from testifying at all.
Moreover, the excluded portion of Tressel’s opinion testimony was offered as secondary evidence targeted solely at impeaching the victim’s credibility on her claim of rape, rather than being offered as substantive evidence relating to Frazier’s guilt or innocence on the kidnapping charge. The excluded opinion testimony related to whether Frazier raped the victim, not whether he kidnapped her. Cf. United States v. Burroughs, 830 F.2d 1574, 1578-80 (11th Cir.1987) (effect of withholding impeachment evidence not sufficiently prejudicial to merit new trial where sufficient evidence of substantive guilt was presented and government's witness was impeached through other means). Nor was Frazier prevented from impeaching the victim’s credibility through other means, and indeed, he took ample advantage of other opportunities to do so. The defense sought to undermine the credibility of the victim's account of kidnapping and rape by, among other things, pre-sénting evidence that she did not appear to be upset or afraid when she accompanied the defendant when he purchased gasoline and cigarettes, nor, notably, did she try to escape; that she lit a cigarette for Frazier while in the car; and that she did not initially tell police she had been raped immediately after being removed from her car. Evidence was also offered establishing that the victim was calm and did not appear upset when she was taken to the hospital. This evidence, when combined with the undisputed presentation of facts that neither the defendant's hair nor semen were found on the victim’s person or in her car, provided Frazier ample opportunity to present to the jury his basic defense that the victim had manufactured the entire account of abduction and rape.
Finally, the exclusion of some of Tressel's opinion testimony (even if error) was harmless because the other evidence of Frazier's guilt was so substantial. See United States v. Fortenberry, 971 F.2d 717, 722 (11th Cir. 1992). The defendant's own account of the night in question was patently incredible and unbelievable, and Frazier's account itself constituted substantive evidence of his guilt. See United States v. Bennett, 848 F.2d 1134, 1139 (11th Cir.1988) (observing that "a defendant's implausible explanation may constitute positive evidence in support of a jury verdict,” and that where the defendant's story was "dubious, if not wholly incredible ... [a] reasonable jury might well disbelieve the explanation and conclude that the [defendant was] lying in an attempt to cover up illegal activities”). After his arrest, Frazier told the FBI that, after drinking beer all day (indeed, after finishing off three 12-packs of beer by 6:00 that evening), he was sitting on a bench in a Wal-Mart parking lot, when he was approached by an 18-year-old woman who was a complete stranger, and who initiated a conversation with him, offering to give him a ride home. Frazier claimed that, after driving out of the parking lot, the victim asked him to drive for a while, in spite of the fact that he was intoxicated and had told her he had no valid driver’s license. The defendant also claimed that he did not pull over when her father tried to flag him down, and when the police joined the lengthy, high-speed chase, because the victim directed him to do so. Plainly, the jury could find this account wholly implausible.
Even leaving aside Frazier’s own dubious explanation of the events that Halloween night, there was other substantial evidence from which the jury inferred his guilt. Frazier entered the vehicle at Wal-Mart on the driver's side and sat in the rear seat directly behind the victim, an action consistent with an abduction under the threat of violence. Indeed, if the victim had volunteered to give Frazier a ride, he likely would have sat in the front passenger seat. In addition, Frazier was arrested carrying a knife locked in the open position, a development wholly consistent with the victim’s account. We add that, given his intoxicated state, the very fact that he was driving suggested he took control of the car by force and against the victim's will. Finally, and perhaps most importantly, Frazier’s long and harrowing flight from the police — at speeds up to 100 miles per hour — was strong evidence of consciousness of guilt, as this Court has repeatedly held. See, e.g., United States v. Bldkey, 960 F.2d 996, 1000 (11th Cir. 1992) (evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt itself); United States v. Beard, 775 F.2d 1577, 1581 (11th Cir.1985) (evidence of flight can raise inference of consciousness of guilt); Monnette v. United States, 299 F.2d 847, 851 (5th Cir. 1962) (flight from law enforcement officers is evidence of guilt).
*1268 Thus, given the substantial evidence presented at trial from which Frazier’s guilt could be inferred, and the exculpatory hair and' s.emen testimony actually presented, we find it exceedingly remote that the jury’s verdict would have been different even if Tres-sel’s "expectancy” opinion had been admitted. Its exclusion did not have a substantial impact on the outcome of the case, nor are we left with grave doubt that the case’s outcome was affected. Any claimed error was harmless. See, e.g., United States v. Darwin, 757 F.2d 1193, 1204 (11th Cir. 1985); United States v. Vesey, 338 F.3d 913, 918 (8th Cir. 2003);, United States v. Smith, 736 F.2d 1103, 1108 (6th Cir. 1984).

. On appeal, Frazier has raised a fourth claim. He says that the trial court made no pre-trial determination that Lanning and Onorato were qualified as experts, or for that matter, that ' their opinions were reliable. However, at trial Frazier never objected to the testimony of Lanning and Onorato as being unreliable, and never challenged their expert qualifications. Absent some objection from Frazier as to the qualifications of Lan-ning and Onorato, or concerning the reliability of their opinions, we review only for plain error the district court's implicit determination that they were qualified and their opinions were reliable. See Christopher v. Cutter Labs., 53 F.3d 1184, 1192 (11th Cir. 1995) (absent objection to expert's testimony, court of appeals reviews challenged testimony only for plain error); see also Macsenti v.. Becker, 237 F.3d 1223, 1231-32 (10th Cir.2001) (decision to admit expert testimony reviewed only for plain error when timely objections under Daubert are not made); McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1406-07 (8th Cir.1994); 4 Weinstein's Federal Evidence § 702.02[6][a] ("In the absence of an objection, rulings admitting .or excluding expert testimony without a reliability determination are reviewable only for plain error.”).
It is true that the 'trial judge did not make an explicit determination on the record as to Lanning's and Onorato’s qualifications, or concerning the reliability of their opinions, and doing so'may have been the better course here. Nevertheless, we are not persuaded that the district court, when faced with no objection, was obliged to formally memorialize its determinations regarding qualifications and reliability on the record. See, e.g., United States v. Locascio, 6 F.3d 924, 938-39 (2d Cir. 1993). Here, then, we examine the district court’s implicit rulings that Lanning and Onorato were qualified and their opinions were reliable for plain error. We find plain error only where (1) there is an error; (2) the error is plain or obvious; (3) the error affects the defendant's substantial rights in that it was prejudicial and not harmless; and (4) the error seriously affects the fairness, integrity, or public reputation of a judicial proceeding. See United States v. Chisholm, 73 F.3d 304, 307 (11th Cir. 1996).
After reviewing the testimony offered by experts Lanning and Onorato, we conclude that the district court did not commit plain error ‘ in failing to exclude their testimony because they were unqualified or because their opinions were unreliable. As discussed supra, both Lanning and Onorato demonstrated expert qualifications before offering any opinions, and provided specific and detailed quantitative bases for their opinions, in marked contrast to Tressel. There was no error, let alone one that was plain or obvious. *1269 Moreover, we can discern nothing that calls into question the fairness, integrity, or reputation of the judicial proceeding.

. The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) ien banc).

. In her opening statement, Frazier’s counsel explained that the defense hinged on attacking the credibility of the victim's story by suggesting, among other things, that the failure to recover hair or fluid evidence implied the victim was lying. She said:
[I]n the end what it comes down to is going — it’s going to be — your decision is going to be based on whether or not you believe [the victim] or don’t believe [the victim].
Now, as we all know from common sense the — if there has been a sexual encounter, the lengthier the encounter, the more contained the area, the more likely there is going to be some transfer of hair, some transfer of body fluids, things that for you as jurors are important because if they exist, if they can be corroborated, it corroborates [the victim's] version of what happened. ...
*1270 And after the fact ... nothing is recovered that corroborates [the victim’s] description of what happened.
... I submit to you ... that when you hear all of the evidence in this case ... you will have not just a reasonable doubt, you will have a substantial doubt about what [the victim] has told you happened on Halloween night last year.
R7 at 79-81.