OPINION OF THE COURT
JACOBSON, Judge:
The appellant was convicted, contrary to his pleas, of one specification of committing an indecent act upon ER, the 11-year-old daughter of a coworker, in violation of Article 134, UCMJ, 10 U.S.C. § 934. He was sentenced by officer and enlisted members to a dishonorable discharge, confinement for 337 days, and reduction to E-l. The convening authority approved the findings and sentence as adjudged.
On appeal, the appellant raises two assignments of error. First, he claims the military judge abused her discretion when she denied a defense motion in limine to exclude testimony by a government expert witness regarding the transference of deoxyribonucleic acid (DNA). Second, the appellant asserts he received ineffective assistance of counsel at trial.[1] Finding no merit in either of the appellant’s assignments of error, we affirm the findings and sentence.

Background

At the time of trial, the appellant was a 30-year-old staff sergeant (SSgt) assigned to the 86th Mission Support Squadron at Ram-stein Air Base (AB), Germany. He had been on active duty for more than 12 years.
While stationed at Ramstein AB, the appellant developed a friendship with a coworker named SSgt MD. SSgt MD is married to ED, and the couple has four children, all girls. At the time of the incident that led to this court-martial, the girls were ages 11, 6, 5, and 1. The oldest daughter, ER, is the victim in the ease.
The D family lived in Landstuhl housing, which is near Ramstein AB. As the friendship between SSgt MD and the appellant progressed, the appellant became a frequent visitor at their apartment, coming over regularly to socialize. Activities during his visits included drinking alcohol with SSgt MD and eating dinner with the family. ED testified that the appellant was well-liked by the family and the girls often referred to him as “Mr. Al” or “Uncle.”
On 28 June 2002, the appellant was again visiting the D’s apartment. SSgt MD had invited the appellant over for drinks and dinner to celebrate SSgt MD’s birthday. Over the course of the evening, the men drank beer and mixed drinks. When dinner ended, the family socialized with the appellant in the living room. The group chatted, danced, played games, and engaged in some roughhousing with the children. At approximately 2300 hours, ED told the children to get ready for bed, so the three oldest girls left the living room, put on their pajamas, and went to a back bedroom shared by the two middle girls. One sister climbed into the top bed of the room’s bunk bed, while ER and her other sister took the lower bed. The girls began to watch a movie.
A few minutes later the appellant entered the bedroom. According to ER’s testimony at trial, the appellant sat on the bed for a few minutes and briefly tickled her leg before leaving the room. A short time later, the appellant returned to the room. Finding the two younger girls asleep, he sat down on the lower bed, leaned against the wall, and started watching the movie with ER. Shortly thereafter, according to ER, the appellant began tickling her leg again. She testified he first tickled her near the knee, then moved his hand higher up her leg, and then moved it still higher, continuing to tickle her. He then held her legs apart and inserted his left thumb under her panties and into her vagina. ER testified that the appellant then began lowering his head toward her vagina, but stopped when ER said “no.” The appellant retreated from the room. A few minutes later ER went to her mother’s bedroom and told her about the incident. The family immediately called SSgt MD’s supervisor and reported the incident. Within 15 minutes, the supervisor’s husband arrived at the apartment with two military police officers. The military police apprehended the appellant and removed him from the apartment.
*716 The appellant was questioned by agents from the Air Force Office of Special Investigations and denied any wrongful touching. In a written statement he admitted going into the girl’s bedroom, sitting on the bed, and leaning against the wall. He also admitted that when he leaned back against the wall, his hand inadvertently touched ER’s thigh, but denied touching her in any other way. Investigators scraped underneath the appellant’s fingernails and scrubbed his fingers and sent these samples to the United States Army Criminal Investigation Laboratory (USACIL), where Dr. Tim Kalafut performed DNA extraction and comparison. Dr. Kalafut found DNA in the fingernail samples taken from the appellant’s left hand that matched ER to a high degree of probability. He also found DNA in the samples taken from the appellant’s right hand that matched ER to a lesser degree of certainty.

Testimony of Expert Witness

At trial, the government called Dr. Kalafut as an expert witness. In challenging portions of Dr. Kalafut’s testimony via a motion in limine, trial defense counsel specifically stated they were not challenging the doctor’s opinion that ER’s DNA was, in fact, present under the fingernails of the appellant’s left hand. What trial defense counsel did object to, however, was the anticipated testimony by Dr. Kalafut that, in his opinion, the most likely source of the DNA was oral or vaginal contact with ER. After hearing Dr. Kalafut’s testimony (in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session), conducting extensive discussion with counsel, and listening to argument, the military judge denied the defense motion and allowed Dr. Kalafut to testify as to his opinion regarding DNA transference. Before this Court, the appellant asserts the military judge abused her discretion by allowing this specific portion of the expert’s testimony to be presented to the members.
We review the issue of admissibility of evidence under an abuse of discretion standard. GE v. Joiner, 522 U.S. 136, 138, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); United States v. Houser, 36 M.J. 392, 397 (C.M.A.1993). A military judge’s conclusions of law are reviewed de novo. United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F.1995). If the military judge’s ruling is based on an erroneous view of the law, the judge has abused her discretion. United States v. Nash, 44 M.J. 456, 457 (C.A.A.F.1996).
The starting point for expert testimony issues is with the Supreme Court opinions in Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In Daubert, the Court held:
Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to [Fed. R.Evid.] 104(a)[2] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.
509 U.S. at 592-93, 113 S.Ct. 2786 (footnotes omitted). The Court proposed a list of non-mandatory factors that may be considered by a trial judge in evaluating proffered expert testimony, and emphasized that the inquiry to be undertaken by the trial judge under Fed.R.Evid. 702 is a flexible one in which the focus must be on principles and methodology, rather than the conclusions they generate. Id. at 594-95,113 S.Ct. 2786.
Subsequently, in Kumho Tire, the Supreme Court extended the Daubert rationale to expert testimony in the areas of “technical” and other “specialized knowledge” covered by Fed.R.Evid. 702. 526 U.S. at 149, 119 S.Ct. 1167. In doing so, the Court reiterated its view of the trial judge as the “gatekeeper” whose function is to “ensure that any and all scientific testimony ... is not only relevant, but reliable” and extended the “gatekeeper” concept to all expert testi *717 mony. Id. at 145 and 147, 119 S.Ct. 1167 (citing Daubert, 509 U.S. at 589, 113 S.Ct. 2786).
Our superior court, in applying the Dau-bert and Kumho Tire precedents to military practice, explained that admission of opinion testimony by an expert in a court-martial is governed by Mil. R. Evid. 702, which requires qualification of the expert “by knowledge, skill, experience, training, or education.” United States v. Quintanilla, 56 M.J. 37, 84 (C.A.A.F.2001). The court went on to point out that the “rules of evidence provide expert witnesses with testimonial latitude broader than other witnesses on the theory ‘that the expert’s opinion will have a reliable basis in the knowledge and experience of his discipline.’ ” Id. at 85 (quoting Kumho Tire, 526 U.S. at 148,119 S.Ct. 1167).
In this case, the government offered Dr. Kalafut, an expert who held a bachelor’s degree in chemistry and a doctorate in toxicology. His experience included employment at the Dallas County, Texas Crime Lab, and then USACIL. Dr. Kalafut testified that, in addition to receiving and providing training on DNA testing at his places of employment, he had received additional training through the Federal Bureau of Investigation Academy. He had testified in approximately 30 previous court proceedings. He also stated he consulted daily with the other 16 eowork-ers in his laboratory, including consultation on the samples at issue in the present case, and that his peers routinely reviewed his work. He testified that he had performed thousands of DNA extractions and profiles similar to this one. Significantly, he also testified that he was familiar with the most common methods of extracting samples for DNA testing—through the use of cheek swabs or blood. The government offered Dr. Kalafut as “an expert in DNA”—a sweeping generalization of his expertise to which the trial defense counsel did not object. The military judge ruled that Dr. Kalafut would be so recognized.
The objection raised at trial and asserted as error on appeal was the proffered evidence that, in Dr. Kalafut’s opinion, the DNA extracted from the scrapings under the appellant’s fingernails most likely came from either oral or vaginal contact with the victim. The military judge spent a good deal of time trying to narrow the issue presented by the defense’s motion in limine. Directing her remark to trial defense counsel, the military judge ultimately summed up the issue as follows:
[Military Judge]: You want me to determine that DNA transference is a separate science from the DNA. If I reject that, then you want me, nonetheless, to evaluate further whether or not, as a motion in limine, this particular matter is supported by the science sufficient to allow it to come before the members.
[Assistant Defense Counsel]: I’ll agree that’s a fair assessment of the issue.
After deliberating, the military judge denied the defense motion and entered her findings of fact on the record. In her ruling, she concluded, “the opinion as to the most likely source of the donor DNA under another’s fingernails does not constitute a separate science, as argued by the defense, but rather constitutes a conclusion based on the science of DNA, coupled with the personal experience of the scientist.” The military judge based her ruling on her interpretation of Daubert, Kumho Tire, and Mil. R. Evid. 702.
The military judge also cited United States v. Frazier, 387 F.3d 1244 (11th Cir.2004), cert. denied, 544 U.S. 1063, 125 S.Ct. 2516, 161 L.Ed.2d 1114 (2005), “[a]s further support for the court’s ruling.” She used the following three-part inquiry used to analyze proffered expert testimony in Frazier:
Trial courts must consider whether:
1. The expert was qualified as competent regarding the matters he intended to address;
2. The methodology by which the expert reached his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by Kumho Tire and Daubert;
3. The testimony assists the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or to determine a fact in issue.
*718 Frazier, 387 F.3d at 1260 (citing City of Tuscaloosa v. Harcros Chems., 158 F.3d 548, 562 (11th Cir.1998), and Daubert, 509 U.S. at 589, 113 S.Ct. 2786). We note that the test itself is actually derived from the holding in Daubert, and was both appropriate and helpful in this case.
When the military judge applied the facts in this case to the above test, she found the following:
Dr. Kalafut is qualified as an expert, based on his Ph.D., his four and a half years as a forensic biologist, and his performance of thousands of DNA extractions in hundreds of cases.
Dr. Kalafut’s particular expertise in the subject of his testimony “shape the reliability inquiry.” Taken from Kumho Tire, 526 U.S. at 150, 119 S.Ct. 1167.... [T]he reliability is established by Dr. Kalafut’s precision and logic. The analysis is based on reason and experience.
Dr. Kalafut’s specialized and relevant knowledge is in an area unknown to most lay people. Such expertise would help a jury reach a conclusion about the allegations in this case.
We have carefully considered the military judge’s findings of fact and conclusions of law and adopt them as our own. We agree with the military judge that the appellant’s attempt to separate the science of DNA into “separate sciences” of DNA transference and DNA extraction and analysis is not appropriate, especially when applied to the facts of this case and the expertise of this particular expert. See Frazier, 387 F.3d at 1260. Experts generally do not work in a vacuum. In analyzing scientific data, they rely on a variety of factors, including education, experience, and common sense. In this case, Dr. Kalafut’s education and experience were not questioned by the appellant, and the notion that he would be totally unqualified to opine as to how DNA—the subject of his expertise—is transferred from one location to another is meritless.[3]
Dr. Kalafut acknowledged that studies did not exist to support his specific theory that “DNA is more likely to bind to fingernail scrapings from vaginal and oral contact,” but opined that the difficulties in obtaining subjects willing to participate in such a study were likely a limiting factor. We find this situation similar to that anticipated by the Supreme Court in Kumho Tire when it stated, “It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist.” 526 U.S. at 151, 119 S.Ct. 1167.
The Supreme Court also addressed an underlying concern of the Daubert parties that the appellant similarly seems to advance in this case—the possibility of a “befuddled jur[y] ... confounded by absurd and irrational pseudoscientific assertions.” Daubert, 509 U.S. at 595, 113 S.Ct. 2786. The appellant appears to be overly pessimistic about the capabilities of the members and of the adversary system generally. See id. at 596, 113 S.Ct. 2786. The Court posited that “[vjigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.” Id. The record reflects the appellant used all these tools effectively in attacking the expert’s testimony and there is no indication that the members were left befuddled or confounded by Dr. Kalafut’s opinion.
We therefore hold that the military judge did not abuse her discretion in finding that DNA transference is not a separate science from DNA extraction and analysis, and allowing the expert to testify as proffered.
Assuming, arguendo, that the military judge did abuse her discretion by allowing the expert to testify regarding his theory of DNA transference, we find the error to be *719 harmless. During his testimony on direct examination before the members, Dr. Kalafut ultimately testified as follows:
Q: Doctor, do you have an expert opinion of what the likely means of transference of the DNA was in this case?
A: Well, in this case or any other case where I detect DNA from a foreign person on fingernail scrapings after a significant period of time, such as 12 hours, and if we throw in the variable of short fingernails, the most likely way I can think of—not the only way, but the most reasonable way I can think of would be oral or vaginal contact.
Dr. Kalafut continued to say that “tears” are another good source of DNA. On cross-examination, Dr. Kalafut admitted that the DNA could have come from anywhere on ER’s body and agreed with the defense counsel that there was no way to tell exactly where it came from. Trial defense counsel led the expert through the defense theory that the DNA could have been transferred while the appellant was “roughhousing” with the children earlier in the evening, and Dr. Kalafut agreed that this was a possibility. He stated that every part of the body sloughs off epithelial cells, and that cells from the scalp, for example, are indistinguishable from cells from the vagina or mouth. Dr. Kalafut did express his opinion that skin cells were more likely to transfer and attach themselves under another person’s fingernails when they were suspended in some sort of bodily fluid—thus contact with a person’s mouth, vagina, or tears would be more likely to leave epithelial cells under a person’s fingernails than, for example, shaking hands.
In our view, the appellant exaggerates the importance of Dr. Kalafut’s DNA transference opinion to the government’s case. While the doctor was allowed to testify that the most likely source of the genetic material under the appellant’s fingernails was “vaginal or oral contact,” this opinion was strongly and effectively challenged during cross-examination, and indeed, supplemented with the possibility of “tears” during direct examination of the witness. The expert conceded that many other sources and methods of transference—all consistent with the defense theory of the case—were possible. He also conceded that there were no peer-reviewed studies to support his opinion. By the end of his testimony, the DNA transference opinion was a fairly insignificant side issue.
On the other hand, the government presented a significant amount of evidence consistent with the appellant’s guilt: the victim’s largely unchallenged testimony; the defense’s concession that the DNA analysis itself was valid and correct; testimony of the emergency room physician and another physician called as a government expert who testified about the significance of the victim’s post-assault complaint of pain on urination; the appellant’s prior statement in which he admitted being on the bed with the victim and inadvertently touching her thigh; and the testimony of family members and friends regarding the victim’s immediate reaction to the assault. Even entirely disregarding the expert opinion evidence in issue today, we would be firmly convinced of the appellant’s guilt beyond a reasonable doubt. See United States v. Turner, 25 M.J. 324, 324-25 (C.M.A.1987). Further, we are convinced beyond a reasonable doubt that the members would have reached the same conclusion.
In fact, we believe that had the military judge not allowed the expert to testify regarding his theory of DNA transference, the appellant would have been in a worse tactical position than he found himself after the testimony was allowed. After the government opened the door with its theory of how ER’s DNA got under the appellant’s fingernails by presenting Dr. Kalafut’s rather weak and heavily-hedged opinion, the appellant was allowed to present multiple reasonable alternative theories. These included the theories that the DNA could have been transferred through roughhousing, or through touching ER’s underarms (presumably by lifting her up), or by contact with her scalp. Had these theories not been presented to the members, the government’s case would have included the victim’s testimony describing how the appellant placed his left thumb into her vagina, the victim’s parents’ testimony, the attending physician’s observations, the expert physician’s opinions, the appellant’s admis *720 sions, and the undisputed evidence of ER’s DNA found under the fingernails of both of the appellant’s hands. Because the door would not have been opened to DNA transference, the appellant would not have been allowed to present his alternative explanations as to how ER’s DNA could have come to rest under his fingernails, absent opening the door himself. Had the appellant done so, of course, the government would have been free to elicit the expert’s opinion on the most reasonable theory of transference, and the appellant would be no better off than he is today.
Thus, we hold that even if the military judge erred by allowing the expert testimony in issue here, the error was harmless in that it was overwhelmed by the plethora of additional evidence presented by the government.

Ineffective Assistance of Counsel

We have reviewed the appellant’s second assignment of error and find it to be without merit. For a claim of ineffective assistance of counsel, an appellant must overcome a strong presumption that defense counsel has “rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.” Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The appellant must prove that counsel’s performance was deficient and this deficiency prejudiced the appellant. Id. at 699, 104 S.Ct. 2052. The appellant has not offered any evidence that overcomes the presumption that his counsel acted reasonably and rendered adequate assistance.
The appellant’s counsel made a logical tactical decision not to request that the government test ER’s underwear for the presence of the appellant’s DNA. At best, the evidence would have been inconclusive, at worst it would have further implicated their client. During findings argument, trial defense counsel referred twice to the government’s failure to test the underwear, thereby raising the possibility of missing evidence without facing the risk of the tests being detrimental to the appellant’s ease. Though the appellant may not agree with his counsel’s actions at this stage of the litigation, the strategy they used at trial was logical and certainly did not fall short of the standard annunciated by the Supreme Court in Strickland.

Conclusion

The findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ, 10 U.S.C. § 866(c); United States v. Reed, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings and sentence are
AFFIRMED.

. This issue was raised pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A.1982).

. The relevant language of Fed.R.Evid. 104(a) is essentially identical to the relevant language of Mil. R. Evid. 104(a).

. Dr. Kalafut also testified that he had shared his theories about this case with his peers, presumably benefiting from their expertise as well.