A05A0855. BOOTH v. QUALITY CARRIERS, INC.
(623 SE2d 244)

PHIPPS, Judge.

Quality Carriers, Inc. is a transportation company that contracted with FMC Corporation to transport the hazardous material lithium butoxide between a chemical processing facility operated by Optima Chemical Group, LLC in Georgia and an FMC facility in North Carolina. Quality used its tractor-trucks to transport the lithium butoxide in cylindrical containers called "isotainers." FMC leased the isotainers and the chasses on which the isotainers were hauled from another company, and FMC provided Quality with the isotainers and chasses. While Optima employee Alvin Booth was connecting a hose to one of the isotainers in preparation for a delivery to FMC, a valve on the isotainer exploded and sprayed Booth with hazardous material.

To recover for injuries sustained, Booth brought this suit against Quality and others. Quality moved for summary judgment on the ground that it had breached no duty of care owed to Booth. Booth appeals the trial court's grant of Quality's motion. For reasons which follow, we affirm.

Quality is a motor carrier engaged in the transportation of bulk commodities. Louis Jay was one of the drivers of Quality's tractor-trucks. Although Jay was classified as an independent contractor, he received safety instructions and training from Quality. On April 10, 2000, Quality transported an isotainer containing lithium butoxide from the Optima plant in Douglas, Georgia, to FMC's plant in Bessemer City, North Carolina. The isotainer, described as "empty" in the bill of lading prepared by FMC, was transported back to Georgia's Optima plant by Jay. He began the trip at about 3:30 p.m. on April 10 and arrived at the Optima plant in Georgia at about 8:00 a.m. on April 11. The 370-mile trip thus took between 16 and 17 hours. The driving time should have been about eight hours, as Jay testified that he traveled approximately 50 mph along state roads. Although Jay must therefore have stopped for hours along the way, he had no specific recollection of the trip and did not recall where he had stopped. No procedures were in place for him to monitor his cargo during stops.

At about 2:00 p.m. on April 11, which would have been about six hours after Jay delivered the isotainer to Optima, Booth and his co-worker Kenneth Wilson climbed to the top of the isotainer to reload it with the lithium butoxide. To do that, they had to remove a flange cover and then connect hoses to the isotainer. As Booth was removing the last bolt from the flange, he dropped his wrench into a recessed area of the isotainer housing a liquid discharge release valve. In retrieving the wrench, Booth accidentally made contact with the valve. It began to hiss and then it exploded, spraying Booth with alkaline and causing him to sustain disabling occupational injuries.

As part of his job duties, and pursuant to federal regulatory requirements, Jay had performed a pre-trip inspection of the moving parts of his tractor-truck and the chassis to ensure their safe operation. As part of his pre-trip inspection, Jay had also engaged in a procedure known as "securing the load," which consisted of examining the isotainer, and various valves on it, to ensure that there would be no residual liquid seepage in transit. Jay was not, however, aware of the existence of the liquid discharge valve on top of the isotainer, about 16 feet above ground level. He testified that if he had been aware that it was there, he would have checked it as part of his pre-trip inspection. Jay, however, had no way to determine the pressurization (or presence) of any residual liquid in the isotainer.

Booth presented evidence that after the lithium butoxide was unloaded from the isotainer at the FMC plant in North Carolina, all

valves on the isotainer were undamaged and had been properly resealed. Because Jay's responsibilities ended when the chassis containing the isotainer was unhooked at Optima's Georgia facility, he performed no inspection of the isotainer or its valves upon delivery. Neither Booth nor Wilson conducted an inspection either. Before Booth dropped his wrench in the area of the liquid discharge valve, he and Wilson did notice a small amount of fluid seepage from it, and they realized the potential danger posed. Booth, however, testified that he had noticed no physical damage to the valve. After the accident, Optima inspected the valve and found that its safety locking pin had been damaged and had become unseated (and that the valve was missing a squeeze handle needed to release the locking pin). Optima's incident report listed as contributing causes to the accident that Booth had not been properly trained, that his protective gear was not being worn properly, that safety procedures for loading the isotainer were lacking, and that the safety pin on the valve had malfunctioned.

Booth charges Quality with negligence in breaching its duty under Georgia law and under federal statutes and regulations to inspect the isotainer and keep it in safe operating condition.

> To state a cause of action for negligence in Georgia, the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.[1]

Under Georgia law, common carriers are bound to use extraordinary care and diligence for the safety of their passengers.[2] And in cases of loss or damage to goods, common carriers are liable as insurers "unless the loss was occasioned by the act of God or the public enemies of the state."[3] Federal regulations governing the transportation of hazardous material also require the carrier to inspect the receptacle in which the material is being transported to ensure that

---

[1] *Heston v. Lilly*, 248 Ga. App. 856, 857-858 (1) (546 SE2d 816) (2001) (citation omitted).

[2] OCGA § 46-9-132; *Sheffield v. Lovering*, 51 Ga. App. 353, 354 (180 SE 523) (1935). Quality does not dispute its classification as a common carrier.

[3] OCGA § 46-9-1; see *Seaboard Air Line R. Co. v. Henry Chanin Corp.*, 84 Ga. App. 442, 443 (1) (66 SE2d 113) (1951).

the receptacle is in the condition necessary to perform its containment function.[4] Federal safety regulations also require motor carriers to inspect, repair, and maintain all motor vehicles under their control to ensure that parts and accessories are in safe operating condition.[5] Georgia law generally provides that the carrier's responsibility begins with delivery of the goods to it and ceases with its delivery of the goods at destination.[6]

*Seaboard Coast Line R. v. Mobil Chem. Co.*,[7] relied on by Booth, bears some similarity to this case but is ultimately distinguishable from it. There a carrier, Seaboard Coast Line Railroad, transported a hazardous material in a tank car provided by the shipper, Mobil Chemical. Mobil inspected the tank car prior to delivering it to Seaboard and found no defects. Seaboard likewise inspected the tank car after delivery by Mobil and found no defects. But after the tank car had been placed in a railroad train, the train derailed en route to its destination and the tank car leaked the hazardous material. Evidence was presented showing that the derailment was caused at least in part by a defect in the tank car. Seaboard argued that the intent of the Hazardous Material Transportation Act[8] and of the federal regulations governing the safe transportation of hazardous materials in interstate commerce[9] was to impose either an express or implied warranty against latent defects in the tank car upon the shipper Mobil. We rejected that argument, because the same regulations also require the carrier to inspect such materials for defects before accepting and transporting them.[10] We found material issues of fact as to whether reasonable inspection by either Mobil or Seaboard would have revealed the defect.[11] We also recognized that both Mobil and Seaboard could be held liable in negligence to third parties who had sustained damages as a result of the leakage.[12]

This case is distinguishable from *Seaboard* because here the injury-causing incident occurred hours after Quality's responsibility for the isotainer had ended. Therefore, even if Quality breached its duty to inspect the supposedly empty isotainer before transporting it, there was no legally attributable causal connection between that

---

[4] 49 CFR §§ 171.2 (e); 171.8.

[5] 49 CFR § 396.3 (a) (1).

[6] OCGA § 46-9-45.

[7] 172 Ga. App. 543 (323 SE2d 849) (1984).

[8] 49 USC § 5101 et seq.

[9] 49 CFR § 171 et seq.

[10] 172 Ga. App. at 545 (2).

[11] Id. at 546 (3).

[12] Id.

breach of duty and Booth's injuries. And because Booth was not an owner of the goods that were shipped, Quality owed him no absolute duty as an insurer to ensure that they were not damaged. Quality certainly would be liable to Booth if negligence by it in damaging the isotainer had caused or contributed to his injuries. But no one observed any physical damage to any part of the isotainer other than the liquid discharge release valve, and that damage was not observed until after Booth's accident. And even if that valve on the isotainer somehow had been damaged in transit, there is no evidence that the damage was caused by negligence of or imputable to Quality. There is no evidence of any mishap concerning the isotainer, or the chassis on which it was hauled, or the tractor which hauled them, while in Quality's possession. The driver's apparent failure to have monitored his cargo at all times during delivery was not, in and of itself, negligence. For these reasons, no error appears in the trial court's grant of Quality's motion for summary judgment.

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 17, 2005 — 

*Bryant H. Bower, Jr., Berrien L. Sutton, Timothy L. Eidson*, for appellant.

*Hawkins & Parnell, Michael J. Goldman, Ronald S. Masterson*, for appellee.