[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 22, 2011
JOHN LEY
CLERK

No. 10-14136
_____

D.C. Docket No. 1:07-cv-01622-GET

ROLAND L. WALKER,
DEBORAH P. WALKER,

Plaintiffs - Appellants,

versus

CSX TRANSPORTATION, INC.,
a Virginia Corporation,
JOHN DOES 1-10,
Georgia Residents,
NORFOLK SOUTHERN RAILWAY COMPANY,
a Virginia Corporation,
NORFOLK SOUTHERN CORPORATION,
a Virginia Corporation,

Defendants - Appellees,

UNILEVER BESTFOODS OF NORTH AMERICA,
a Division of Conopco, Inc., a New York Corporation,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 22, 2011)

Before TJOFLAT, WILSON and RIPPLE,* Circuit Judges.

TJOFLAT, Circuit Judge:

I.

A.

This negligence suit under Georgia law stems from an injury Roland Walker

suffered as he unloaded freight from a railcar in July 2005.  At that time, Walker

worked for Exel, Inc., the operator of a shipping and receiving facility in Fairburn,

Georgia,[1] which exclusively receives deliveries of food products from Unilever

Bestfoods of North America ("Unilever") on behalf of local Fairburn businesses.

On July 22, the railcar arrived at Exel loaded with fifty-six pallets of containers of

Unilever-produced mayonnaise that Unilever had loaded and shipped from its

Chicago facility.  The railcar was delivered by rail carrier CSX Transportation, Inc.

---

* Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

[1] Exel operates several of these shipping and receiving facilities throughout Georgia.

2

("CSX");[2] the car was, however, the property of another rail carrier, Norfolk

Southern Railway Company and Norfolk Southern Corporation (collectively,

"Norfolk Southern").[3]

The railcar was equipped with two interior bulkhead doors, or "interior load

divider partitions," that allowed the car to be divided into three sections—a center

compartment and two side compartments—for the organized loading of freight.[4]

The bulkhead doors, each weighing 1,000 pounds, were suspended from the

railcar's interior ceiling by a carriage assembly that rolled along a parallel set of

ceiling and floor tracks that ran the length of the railcar.  To load and unload one of

the side compartments behind a bulkhead door, an individual would move the door

back and forth within the railcar along the door's track system by squeezing a

handle, or "release latch," in the center of the door, which would cause four spring-

loaded "locking pins," one in each of the door's corners, to retract from receptacles

---

[2] The railcar was delivered to Unilever for loading by the Belt Railway of Chicago ("BRC") on July 11, 2005.  On July 12, 2005, BRC picked up the loaded and sealed car from Unilever and delivered it to CSX.  CSX then transported the car to Fairburn and delivered it to Exel's facility on July 22; the loaded car remained sealed from the time it left Unilever's facility until its delivery to Exel.

[3] Norfolk Southern leased the freight car but, as Norfolk Southern admits, "for all practical purposes . . . was the owner."  Despite belonging to Norfolk Southern, the railcar, by July 2005, had not been operating on the Norfolk Southern railway system for over 10 months; instead, it had been in the possession of other rail carriers, including CSX.

[4] The railcar was manufactured in 1972; the model is no longer in normal use.

3

in the lower and upper tracks along which the door operated.  Once the locking pins were disengaged, the door could be pushed or pulled freely along its tracks. Thus, when a side compartment of the railcar was loaded with cargo, a bulkhead door would be operated in this way and positioned tightly against the cargo to hold it securely in place during transit.  The door would then be locked against the cargo by releasing the door's latch, causing the spring-loaded locking pins to extend back into the track receptacles[5]—the tracks contained numerous receptacles, allowing the bulkhead door to be locked throughout most of the railcar.  In turn, to unload the compartment behind a locked bulkhead door, an individual would squeeze the door's release latch to retract the locking pins, allowing the door to be pushed or pulled down the tracks and away from the stored cargo.

Exel assigned employee Rodney Thomas to unload the pallets of mayonnaise containers from the railcar.  Thomas commenced the unloading process by opening the railcar's exterior door, at which time he discovered that the pallets Unilever had loaded in the car's center compartment—sixteen in total—had shifted during transit.  As a result, Thomas, prior to unloading the pallets, took photographs to evidence the load shift, anticipating that a claim for loss of product might later arise.  He then unloaded the pallets using a forklift.

---

[5] Due to this function, the release latch on the door is often referred to as a "hand brake."

After that, Thomas sought to unload the pallets loaded in the side compartments behind the two interior bulkhead doors; twenty pallets were loaded behind each door. When Thomas squeezed the doors' release latches, however, he discovered that the doors' locking systems were "jammed," that is, that their locking pins would not easily retract from the receptacles in the ceiling tracks. Thomas then saw Walker working nearby, so he asked Walker if he would assist him in opening the doors; Walker agreed to help and entered the railcar.[6] The two men then proceeded to try to disengage one of the doors: Thomas moved the release latch back and forth in an attempt to loosen it, while Walker grabbed onto the door's frame and pulled.

Soon the bulkhead door's locking pins retracted. Once that happened, however, the door rushed forward at Walker and Thomas. As it was later discovered, as with the center compartment, several of the pallets of mayonnaise containers loaded behind the door had shifted during transport, causing ten to twelve of the pallets—weighing between 18,000 and 22,000 pounds[7]—to fall against the door and to propel the door forward along its tracks. Thomas immediately released the door's latch, yet the locking pins did not extend back into

---

[6] Thomas never mentioned to Walker the load shift in the center compartment.

[7] A single pallet of the mayonnaise containers weighed approximately 1,800 pounds.

5

the track receptacles, and the door continued to charge rapidly at the two men. Thomas, who was positioned near the railcar's exterior door, quickly jumped from the car, but Walker was not able to do so and was struck by the bulkhead door. The door's force then drove Walker into the other interior door, pinning him between the two.[8]

Paramedics eventually released Walker from the doors' clasp, but only after Thomas and other Exel coworkers had removed the fallen pallets of mayonnaise containers from behind the door in order to push the door back along its tracks. As a result of his crushing accident, Walker suffered severe injuries to his shoulder, chest, and leg, all of which required extensive medical care and treatment.[9]

B.

On June 11, 2007, Walker sued CSX for negligence;[10] he subsequently

---

[8] Thomas, in a handwritten statement provided to Exel following the accident, explained the situation thusly:

> In the beginning started on left side bulk head Door (stuck) so started on Right, upon releasing the hand brakes, the pressure was just too great, so it just release itself. I jump out of the way (Rodney) because I was more on the outside or closer. The only thing Roland could've done was brace hisself because he no time too [sic] do anything else.

[9] As compensation for his injury and lost income, Walker received payments from Exel's insurer under Georgia's workers' compensation statute, O.C.G.A. § 34-9-1, et seq. As of June 2, 2008, those payments had exceeded $109,700.

[10] Walker brought the lawsuit in the Superior Court of Fulton County, Georgia. His wife, Deborah Walker, joined him as a plaintiff, seeking consequential damages for loss of consortium. For ease of discussion, we simply refer to the Walkers collectively as "Walker."

amended his complaint on June 29, 2007, to add Norfolk Southern as a defendant.[11]

In his amended complaint, Walker claimed that Norfolk Southern and CSX

(collectively, "Defendants") were jointly and severally liable for his injury in

negligence, and he sought compensatory damages.  Walker alleged that Defendants

had not regularly inspected and maintained the interior bulkhead door's locking

system prior to his injury, despite having had multiple opportunities to do so when

the car had been in their possession.  These omissions were negligent, Walker

asserted, because regular inspections and maintenance of the door were required

under Georgia common law and various rules and guidelines issued by the

Association of American Railroads (the "AAR"), a private railroad-industry trade

association to which Defendants belong.  Moreover, this negligence, Walker

---

[11]  In addition to CSX and Norfolk Southern, Walker's amended complaint named, as defendants, Unilever and ten fictitious "John Does" (i.e., unidentified corporate entities based in Georgia and/or residents of Georgia who were responsible or otherwise involved in the maintenance, inspection, and loading of the railcar).  On November 3, 2008, Walker settled with Unilever, and Unilever was dismissed from the case.

On July 12, 2007, Defendants, under 28 U.S.C. § 1441(a), removed the action to the United States District Court for the Northern District of Georgia based on that court's diversity jurisdiction under 28 U.S.C. § 1332(a).  Diversity existed because Walker is a Georgia citizen, while CSX and Norfolk Southern are both Virginia corporations and Unilever is a division of Conopco, Inc., a New York corporation.  Moreover, that the fictitious defendants were likely Georgia citizens did not destroy complete diversity because § 1441(a) requires that fictitious "named" parties be disregarded for purposes of diversity jurisdiction.  See 28 U.S.C. § 1441(a) ("For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded."); see also Wilson v. Gen. Motors Corp., 888 F.2d 779, 782 n.3 (11th Cir. 1989) (discussing the significance of this language in § 1441(a)); Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 426 n.10 (1st Cir. 2007) ("The presence of John Does does not destroy diversity jurisdiction in cases removed to federal court.").

claimed, had caused his injury, since reasonably discoverable and curable defects in the door's locking system—which Walker's complaint characterized as a "safety mechanism"—had kept the locking system from functioning properly at the time of his injury. According to Walker, had the locking system worked as intended and not been defective, it would have averted his injury by bringing the door to a dead stop once Thomas released the door's latch.

1.

To corroborate his allegations as to the cause of his injury, Walker, during discovery, retained a putative railcar expert named Michael Micek.[12] Micek opined, both in a written report and on deposition, that the bulkhead door's locking system was, in fact, designed as a "fail-safe safety device" to protect workers like Walker, since the locking pins were spring-loaded. Thus, Micek stated, if, as here, cargo fell against the door, causing it to charge forward along its tracks,[13] the locking pins were designed to extend back into the track receptacles once the door's latch was released and to instantly retard the door's movement. Hence, in Micek's opinion, had the locking system functioned properly, as soon as Thomas

---

[12] Micek worked for a railroad between 1965 and 1979; after that, he was an inspector with the Federal Railway Administration for approximately 22 years.

[13] Micek agreed that it was the pallets of mayonnaise containers that fell against the bulkhead door that caused the door to move rapidly forward after Thomas and Walker had disengaged the door's locking system.

released the door's latch, the locking pins would have inserted themselves into the track receptacles and stopped the door's rush, notwithstanding that 18,000 pounds or more of fallen cargo were pressing the door forward. The locking system, however, did not function in that intended way, Micek posited, because the door's locking system had become defective due to poor maintenance by Defendants. That is, according to Micek, "[t]he root cause of th[e] accident . . . was the mechanical imperfections and defective conditions of the locking rails," and the fact that thousands of pounds of shifted cargo were pressing against the door and propelling it down the track "doesn't matter."[14]

2.

After discovery closed, Norfolk Southern moved the district court to exclude from evidence Micek's proposed expert testimony, challenging Micek's qualifications as an expert under Federal Rule of Evidence 702[15] and Daubert v.

---

[14] On October 20, 2007, Micek performed a visual inspection of the railcar; the car by then, however, had been retired.

[15] Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

9

<u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  Additionally, Defendants moved for summary judgment under Federal Rule of Civil Procedure 56,[16] arguing that they were entitled to judgment as a matter of law because the record evidence raised no triable issues of fact for the jury as to whether Defendants were liable under Georgia negligence law.[17]  The district court ruled on all the motions in the same order.

First, the court granted Norfolk Southern's motion to exclude Micek's expert testimony.[18]  Norfolk Southern had argued that Micek's expert opinions should be excluded because they were not scientifically based, premised upon sound methodology, or concerned with areas with which Micek had significant

---

[16]  Summary judgment is granted only if the moving party shows that there is no genuine dispute as to any material fact and that the moving party is therefore entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(a).

[17]  The motion to exclude Micek's expert testimony and the motions for summary judgment were all filed on May 29, 2009.

[18]  We have established, as the district court noted,

> that in determining the admissibility of expert testimony under Rule 702, we engage in a rigorous three-part inquiry.  Trial courts must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir.1998)).

experience based on his prior occupations. In particular, Norfolk Southern had challenged Micek's basis for testifying that the bulkhead door's locking system was designed as a safety device that could reengage and stop the movement of the door as 18,000 pounds or more of cargo fell against it. In ruling on the motion, the court correctly sided with Norfolk Southern, holding that, in short, Walker "ha[d] not met [his] 'burden of establishing qualification, reliability, and helpfulness'" of Micek's expert opinions. Order 8, July 29, 2010 (quoting United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004)).[19]

---

[19] The district court concluded that Micek was unqualified to offer expert testimony about the design, operation, and inspection of the bulkhead door because (1) although he had significant experience working in the railroad industry, his experience with bulkhead doors was self-described as "infrequent" and occurred over thirty to forty years before this case arose; (2) he was not an engineer, and admitted that he had no experience or training as to the design or manufacture of bulkhead doors or analyzing the materials used to construct, operate, or secure a bulkhead door system; and (3) he testified that, prior to this case, he had never investigated an accident involving a bulkhead door, nor personally observed a bulkhead door move in the way the one that injured Walker did. Moreover, Micek never adequately explained the methods he used to reach his opinion that the bulkhead door's locking system was a "fail-safe safety device" that, if it had been functioning properly, would have brought the rushing door to a dead stop, notwithstanding the force of between 18,000 and 22,000 pounds of cargo pushing it down its tracks. Thus, the district court held:

> [W]hile [Micek] may have extensive experience in the railway industry, he was not qualified and did not utilize a sufficiently reliable methodology to offer opinions regarding the design, operation, and alleged safety features of the subject bulkhead door system or the amount of weight or force the bulkhead door locking pins could overcome.
> . . . .
> . . . Micek's opinions, therefore, lack the indicia of reliability necessary to survive a Daubert inquiry and challenge under Rule 702.

Order 8–9, July 29, 2010 (citing McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1240 (11th Cir. 2005)).

11

The court then granted Defendants' motions for summary judgment, holding that the record evidence was insufficient to raise a triable issue of fact on various elements necessary for Walker to prevail on his negligence claims. In Georgia, a negligence plaintiff must establish four elements:

> "(1) [that the defendant had a] legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty."

Booth v. Quality Carriers, Inc., 623 S.E.2d 244, 246 (Ga. Ct. App. 2005) (quoting Heston v. Lilly, 546 S.E.2d 816, 818 (Ga. Ct. App. 2001)). However, the evidence here, the district court ruled, was insufficient for a jury to reasonably infer either that Defendants had breached a legal duty of care by failing to regularly inspect and maintain the bulkhead door or that those omissions, even if negligent, proximately caused Walker's injury. Accordingly, the court dismissed Walker's claims against Defendants as a matter of law. Walker now appeals.

## II.

In his brief on appeal, Walker challenges only that portion of the district court's order granting Defendants summary judgment.[20] He claims that the district

---

[20] We review the district court's grant of summary judgment de novo, applying the same legal standards that bound the district court. See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1327 n.23 (11th Cir. 2011). Because we review the record on a motion for summary

12

court erred because there is a triable issue as to whether Defendants were negligent in failing to regularly inspect and maintain the bulkhead door. Walker's argument is based on various AAR rules and guidelines that, he says, required Defendants, as AAR members, to inspect and maintain the bulkhead door annually.[21] Walker declares that, under Georgia law, the district court erred in not considering these privately established rules as "illustrative of [the defendants'] negligence" and thus as creating a question of fact for the jury. See, e.g., Luckie v. Piggly-Wiggly S., Inc., 325 S.E.2d 844, 845 (Ga. Ct. App. 1984) ("Privately established rules are admissible as illustrative of negligence, but the violation of such a rule is not negligence in and of itself." (internal quotation marks omitted)). We need not assess whether Walker's argument has merit, however, because it plainly ignores the conspicuous fact that, as the district court

held, the record lacks evidence that Defendants' omissions, even if negligent, were a proximate cause of his injury. That is, as explained in the following discussion, even if we assume arguendo that Defendants were negligent, we must affirm the

---

judgment to determine whether there is a genuine issue as to any material fact, "[w]e must view all the evidence and all factual inferences reasonably drawn from that evidence in the light most favorable to the nonmoving party—in this case, [Walker]—and we must resolve all reasonable doubts about the facts in his favor." Id.

[21] For example, Walker cites Rule 6.3.1 in the AAR's 1996 Manual of Standards and Recommended Practices, Section H – Part III, which states that "[b]ulkhead[] [doors] shall be inspected and lubricated at one year intervals."

district court's summary judgment.

Negligence is not actionable under Georgia law unless that negligence was a proximate cause of the plaintiff's injury. See Anderson v. Barrow Cnty., 568 S.E.2d 68, 71 (Ga. Ct. App. 2002) ("[N]o matter how negligent a party may be, if his act stands in no causal relation to the injury it is not actionable." (quoting Bacon v. Mayor & Alderman of City of Savannah, 525 S.E.2d 115, 117 (Ga. Ct. App. 1999) (internal quotation marks omitted))); Davis v. Aiken, 142 S.E.2d 112, 115–16 (Ga. Ct. App. 1965) ("Negligence alone does not give a right of action to an injured person against the negligent person unless the negligence be the proximate cause of the injury and damage."). Proximate causation reflects a policy-based evaluation of whether the negligent defendant should be held legally responsible for the plaintiff's injury, or whether, instead, "the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." Atlanta Obstetrics & Gynecology Grp., P.A. v. Coleman, 398 S.E.2d 16, 17 (Ga. 1990) (internal quotation mark omitted). It is "another way of saying . . . that the defendant was under no duty to protect the plaintiff from the injury which in fact occurred." McAuley v. Wills, 303 S.E.2d 258, 261 (Ga. 1983) (citing William L. Prosser, The Law of Torts 244 (4th ed. 1971)).

No universal formula governs proximate-cause analysis. Coleman, 398

14

S.E.2d at 17. Rather, it is a mixed question of law and fact "to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." Id. Typically, therefore, the inquiry is appropriately left to the jury. See id. ("[Determining] whether proximate cause exists . . . requires both fact-finding in the 'what happened' sense, and an evaluation of whether the facts measure up to the legal standard set by precedent. Ordinarily, both determinations are most appropriately made by a jury upon appropriate instructions from the judge."). Yet, the question should be answered by the court as a matter of law "in plain and undisputed cases," id. at 17–18, that is, in cases where "the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion, that the defendant's acts were not the proximate cause of the injury." Atlanta Gas Light Co. v. Gresham, 394 S.E.2d 345, 347 (Ga. 1990) (internal quotation mark omitted). This is such a case.

Since Walker's negligence claim proceeds on his theory that Defendants breached duties to inspect and maintain the bulkhead door's locking system, in order to satisfy the proximate-cause element and survive summary judgment, there must be evidence reasonably linking his injury to a discoverable and curable defect in the door's locking system. Cf. Ken Thomas of Ga., Inc. v. Halim, 597 S.E.2d 615, 618 (Ga. Ct. App. 2004) (holding, in part, that trial court erred in not granting

15

summary judgment to defendant car dealership in negligence lawsuit because evidence did not support inference that plaintiff's accident, resulting from steering malfunction in car loaned by defendant, was proximately caused by defendant's negligent failure to repair or maintain car); Jordan v. Atlanta Replex Corp., 492 S.E.2d 536, 540 (Ga. Ct. App. 1997) (explaining that summary judgment is proper in slip-and-fall cases alleging defendant's negligent maintenance of premises if plaintiff does not present evidence creating a material issues of fact as to whether a defect caused fall and whether such defect was the consequence of defendant's breach of its duty to maintain premises); Davis, 142 S.E.2d at 117–18 (explaining that a plaintiff, to plead that defendant's negligent failure to make an adequate inspection was a proximate cause of plaintiff's injury, must allege that a defective condition existed that caused the injury and "that an inspection would have discovered the defect").  That is, the evidence must indicate that: (1) at the time of Walker's injury, the door's locking system was defective; (2) the defective condition existed due to Defendants' negligence; and (3) the defect resulted in Walker's injury.

The record evidence, however, does not reasonably connect Walker's injury to a defect in the door's locking system birthed by any negligence on the part of Defendants.  None of the evidence in the record supports the accuracy of Walker's

16

characterization of the locking system as a safety device that was intended to reengage and halt the door's movement when cargo—in this case, 18,000 pounds or more of cargo—pushed the door rapidly forward along its tracks; nor does the evidence suggest that the locking system was otherwise capable of functioning in that way.[22] Indeed, as recognized by the district court as well, the only evidence that supported Walker's impression of the locking system's intended design was the putative expert opinion of Micek, testimony that is properly no longer part of the record because it is too speculative and unreliable. See Order 7, July 29, 2010 ("Micek testified that because the locking pins are spring-loaded, they are designed as a 'fail-safe safety device,' but there is <u>nothing</u> in the record that supports his opinion." (emphasis added)). As a result, the sole reasonable inference to be drawn from the evidence is that, under these facts, the locking system operated just as it had been designed to.[23] Thus, the locking system's inability to stop the door's rapid charge cannot be attributed to a defect begot by Defendants' negligent omissions, since no frequency of inspection or maintenance would have enabled

---

[22] For example, Norfolk Southern's expert, Barry Harmon, testified that the company that originally manufactured the interior bulkhead door did not designate the door's locking system as a safety mechanism. Harmon added that the locking pins were not shaped as, in his opinion, he would expect them to be if they were designed to snap into the receptacles and stop the door's movement under such conditions.

[23] Indeed, the record evidence suggests that the bulkhead door's locking system was intended only to ensure that the door would store cargo securely in place during loading, transportation, and unloading of the railcar—a purpose it fulfilled here.

17

the locking system to do that which it could not do.[24]  Liability for Walker's injury,

therefore, cannot be fairly traced to any negligence on Defendants' part in failing

to annually inspect and maintain the door as required under the AAR rules and

guidelines.  Cf. Henson v. Georgia-Pacific Corp., 658 S.E.2d 391, 394–95 (Ga. Ct.

App. 2008) (upholding summary judgment for defendant in premises-liability case

in which plaintiff alleged that the defendant negligently failed to maintain a freight

---

[24]  Micek stated that the only way in which Defendants could have determined whether the door's locking system could function under such conditions was by playing out the incident beforehand.  This, however, clearly would have been an unreasonable expectation to foist on Defendants given that there is no evidence even suggesting that the locking system was intended to function in that manner and, in turn, no reason for Defendants to have expected it would.

Instead, because the record evidence indicates that the bulkhead door's locking system was designed merely to store loaded cargo securely, a reasonable inspection would have assessed the locking mechanism's suitability for that purpose only.  And such an inspection of the bulkhead door and its locking system was performed—by Unilever, prior to loading the railcar with the mayonnaise containers.  Unilever's inspection included: (1) testing the bulkhead doors to make sure they moved along the tracks properly by pushing and pulling the bulkhead doors in both directions; (2) assessing whether the tracks were broken, bent, or crooked in any way; (3) checking the locking pins on the doors to ensure that they would lock when inserted into the top and bottom track receptacles; and (4) analyzing the release latch to make certain it worked correctly in retracting the locking pins—if the pins failed to release, then the bulkhead door would have become immovable.  This inspection closely tracked the AAR rules and guidelines. For instance, Section II.A1 of AAR Pamphlet No. 17, which the AAR issued in October 1998, provides that shippers like Unilever, in carrying out an inspection of bulkhead doors, must

> inspect the[] doors to determine if they can be moved safely . . . then move doors
> to approximately where they will be located under load.  Engage the locking
> mechanisms to make certain they are operational.  Inspect for full extension of all
> locking pins at the top and bottom of the bulkhead doors.  Locking pins are to
> penetrate the tracks at a minimum of 1/2".

No defects were revealed during Unilever's inspection; had any been discovered, Unilever, pursuant to company policies, would have rejected the railcar without loading it to prevent possible damage to its product during transport.

elevator, the doors of which injured plaintiff, because plaintiff did not present any competent evidence that elevator doors were actually defective at the time of his injury); Davis,142 S.E.2d at 117–18 ("If the inspection would not have discovered the defect, then the failure to inspect cannot be the proximate cause of any injury to the plaintiff."); see also, e.g., Mello v. K-Mart Corp., 792 F.2d 1228, 1233 (1st Cir. 1986) (stating that, under Tennessee products-liability law, even if defendant was negligent in failing to test a product it offered for sale, "that negligence could not have been the proximate cause of the plaintiffs' injuries, because no amount of testing would have weeded out what . . . was a non-defective" product (emphasis in original)). To rule otherwise would require us to unreasonably draw unsupported inferences as to how Defendants' omissions could have caused Walker's accident.[25] See Marshall v. City of Cape Coral, 797 F.2d 1555, 1559 (11th Cir.

---

[25] For instance, Walker doggedly seeks to overcome his lack of evidence in support of proximate causation by claiming that "common sense" weighs in his favor. He contends that it is common knowledge that unlubricated metal may "seize up," and thus that a jury could reasonably infer that the bulkhead door's locking pins, due to Defendants' long-term neglect, "seized up," rendering them unable to reengage in the track receptacles and stop the door's charge. Walker's contention, however, is misguided. Whether or not such knowledge of the physics of metal is truly "common," it is not a sound basis on which a jury could hold Defendants liable, since there is no evidence that, under these facts, "un-seized up" locking pins would have halted the door's movement. Absent such evidence, a jury, to rule in Walker's favor, would have to rely impermissibly upon its own subjective conjecture—or what Walker calls "common sense"—as to the locking pins' ability to stop the door had the pins been better lubricated; this we will not countenance. See Marshall v. City of Cape Coral, 797 F.2d 1555, 1559 (11th Cir. 1986); see also, e.g., Grinold v. Farist, 643 S.E.2d 253, 254 (Ga. Ct. App. 2007) ("A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of

19

1986) (stating that, although "[a]ll reasonable inferences arising from the evidence must be resolved in favor of the non-movant, . . . inferences based upon speculation are not reasonable" (citing Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985)).

Based on the foregoing, the district court was correct in granting Defendants summary judgment. Walker presented no evidence from which a jury could infer that Defendants' omissions, even if negligent, were a proximate cause of his injury, an essential element of his negligence claim under Georgia law. See United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) ("If the nonmoving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)). The district court's judgment is therefore

AFFIRMED.

---

the court to grant summary judgment for the defendant."